**In re GLOBAL CROSSING, LTD. SECURITIES LITIGATION**

**No. 02 Civ.910 GEL.**

United States District Court, S.D. New York.

Dec. 22, 2003.

---

Jay W. Eisenhofer, Sidney S. Liebesman, Michael, J. Barry, Lauren E. Wagner, and Marlon Q. Paz, Grant & Eisenhofer, P.A., Wilmington, DE, for Lead Plaintiffs Public Employees Retirement System of Ohio and State Teachers Retirement System of Ohio.

Howard W. Goldstein and Peter L. Simmons, Fried, Frank, Harris, Shriver & Jacobson, New York City, for defendants the "April 2000 Underwriters."[1]

George A. Schieren, Michael D. Torpey, Steven F. Gatti, and Ignatius A. Grande, Clifford Chance US, LLP, New York City, for defendants Merrill Lynch & Co., Inc. and Merrill Lynch, Pierce, Fenner & Smith, Inc.

Kenneth M. Kramer, Richard Schwed, and Amy L. Neuhardt, Shearman & Sterling LLP, New York City, for defendants Morgan Stanley and Morgan, Stanley & Co., Inc.

Thomas P. Ogden and Christopher L. Garcia, Davis, Polk & Wardwell, New York City, for defendants, Donaldson Lufkin & Jenrette, Inc. and Donaldson, Lufkin & Jenrette Securities Corp.

## OPINION AND ORDER

LYNCH, District Judge.

In this consolidation of numerous securities class action lawsuits arising from the allegedly "consistent[ ] and pervasive[ ]" misrepresentation of the "true financial condition" of Global Crossing, Ltd. (GC), between February 1, 1999 and January 28, 2002 (the "class period") (P. Mem.4), four groups of defendants, all banking institutions that underwrote GC securities or issued fair value opinions in connection with transactions involving those securities, have separately moved to dismiss the counts in which they are named on a variety of grounds. Because the four motions involve similar issues, the plaintiffs have opposed all four in a single Joint Memorandum, and the Court will decide them together. The motions will be granted in part and denied in part. Counts II and VII will be dismissed as time-barred, and the motions will be denied as to the other counts.

## BACKGROUND

Global Crossing was founded in March 1997 for the purpose of building and sell-

1. The Goldman Sachs Group, Inc.; Goldman Sachs & Co.; Merrill Lynch & Co., Inc.; Merrill Lynch, Pierce, Fenner & Smith, Inc.; Salomon Smith Barney Inc.; Salomon Smith Barney Holding, Inc.; The Bear Stearns Companies Inc.; Bear, Stearns Co. Inc.; Bear, Sterns Securities Corp.; J.P. Morgan Chase & Co.: J.P. Morgan Securities, Inc.; Chase H & Q; Credit Suisse First Boston; Donaldson Lufkin & Jenrette, Inc.; Donaldson Lufkin & Jenrette Securities Corp.; Morgan Stanley Dean Witter; and Morgan Stanley & Co., Inc.

ing the use of a worldwide fiber optic network for the transmission of internet and telecommunications data. It went public on August 13, 1998, and made several issues of securities throughout the class period. In September 1999, GC acquired Frontier Corporation by exchanging its own shares for Frontier shares. It similarly acquired IXnet, Inc., and its parent IPC Corporation, in early 2000.

A detailed recital of the tale of fraud and deception alleged in the 840–paragraph complaint[2] is unnecessary here. Briefly told, the complaint alleges that various officers and directors of Global Crossing participated in the fraudulent misstatement of Global Crossing's assets, obligations, and cash revenues, particularly in the manner in which they accounted for certain transactions involving "indefeasible rights of use" ("IRUs").

An IRU is the "right to use a specified capacity, or bandwidth, over a designated communications cable owned by a telecommunications company for a set period of time." (Compl.¶ 117.) IRU transactions represented a large portion of the Company's revenues during the class period and therefore played a substantial role in determining the market value of its shares. Plaintiffs claim that GC, in order to meet performance expectations and thereby boost the value of its securities, reported as immediate cash revenue (1) income that should have been booked over the 25–year term of each IRU; and (2) income from unneeded reciprocal "swaps" with other carriers of such capacity, notwithstanding that, where cash actually changed hands, it was "round-tripped" in the return half of the swap, thereby yielding no actual revenue.

The former practice violated Financial Accounting Standards Board ("FASB") Statement No. 13, which restricts the circumstances under which a company may report as immediate revenue the total lease payments due under a multiyear lease agreement. When the FASB issued, in "FASB Interpretation No. 43" ("FIN 43"), a clarification of FASB 13 that clearly prevented GC from continuing to book the IRU payments as immediate cash income, GC announced that compliance with FIN 43 "would not have a material impact on the Company's financial position or results of operations." (Compl. ¶ 156 (quoting unattributed source).) But plaintiffs allege that compliance with FIN 43 would, in fact, have been devastating had GC not found a new source of illusory revenue: reciprocal swap transactions with other telecommunications companies. The practice of booking income from swaps as immediate cash revenue is alleged to have violated Accounting Principles Board Opinion No. 29 ("APB 29"), "Accounting for Nonmonetary Transactions." When these sources of income could not be reported immediately as cash revenue under Generally Accepted Accounting Principles ("GAAP"), GC claimed that its own measures of revenue, styled by GC as "pro forma disclosures," "Earnings Before Interest, Taxes, Depreciation, and Amortization" ("EBIDTA"), and "Adjusted EBIDTA," were better measures of its financial health than financial statements according to GAAP. GC's tactics succeeded, plaintiffs claim, in inflating the value of its stock, resulting in steep losses for shareholders when the house of cards collapsed and GC inevitably went bankrupt in early 2002.

**2.** After these motions to dismiss were fully briefed, plaintiffs filed a 1088–paragraph Amended Consolidated Complaint on August 11, 2003, incorporating the claims of share-holders of Asia Global Crossing, Ltd., a subsidiary of GC. As the additional allegations do not affect the instant motions, all citations here are to the earlier complaint.

Plaintiffs allege that the defendants here, as underwriters of various securities offerings and issuers of "fair value" opinions used to gain shareholder approval for GC's two corporate acquisitions, were at least negligent in not uncovering the illusory basis for GC's revenues and revenue projections, and are therefore liable to plaintiffs under section 11 of the Securities Act, 15 U.S.C. § 77k, and/or section 14 of the Exchange Act, 15 U.S.C. § 78n, for the misstatements they made or endorsed in connection with those offerings or opinions. Specifically, the "April 2000 Underwriters" underwrote secondary offerings of common stock (Count XII) and 6–3/4% preferred stock (Count XIII) on April 3, 2000, and are allegedly liable under Section 11; Merrill Lynch and Morgan Stanley ("the Frontier Defendants") issued fairness opinions which they consented to be used in connection with the Frontier merger Registration Statement and proxy materials, and are allegedly liable under both Section 11 (Count VII) and Section 14 (Count II); and Donaldson, Lufkin & Jenrette ("DLJ") issued fairness opinions which it consented to be used in connection with the IXnet/IPC merger Registration Statement and is allegedly liable under Section 11 (Count XIV).

## DISCUSSION

### I. Legal Standards

#### A. Standard for Dismissal

On a motion to dismiss under Fed. R.Civ.P. 12(b)(6), the Court must accept "as true the facts alleged in the complaint," *Jackson Nat'l Life Ins. Co. v. Merrill, Lynch & Co.*, 32 F.3d 697, 699–700 (2d Cir.1994), and may grant the motion only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Thomas v. City of New York*, 143 F.3d 31, 36 (2d Cir.1998) (citations omitted); *see also Bernheim v. Litt*, 79 F.3d 318, 321 (2d Cir.1996) (when adjudicating motion to dismiss under Fed.R.Civ.P. 12(b)(6), the "issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims" (internal quotation marks and citations omitted)). When deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents attached to the complaint as exhibits or incorporated in it by reference. *Brass v. American Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir.1993). The Court may also take judicial notice of matters of public record, including the contents of documents required to be filed with the SEC. *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir.1991). All reasonable inferences are to be drawn in the plaintiff's favor, which often makes it "difficult to resolve [certain questions] as a matter of law." *In re Independent Energy Holdings PLC*, 154 F.Supp.2d 741, 747 (S.D.N.Y.2001).

### B. Elements of Asserted Claims

Section 11 imposes civil liability on persons preparing materially misleading registration statements. To state a claim under section 11, an injured plaintiff must allege only that a defendant made or participated in making a "material misstatement or omission" in a registration statement for a security the plaintiff acquired; liability for such misstatements extends, among others, to underwriters of securities and to anyone who consented to be "named as having prepared or certified [a] report or valuation which is used in connection with the registration statement." 15 U.S.C. § 77k(4), (5). No intent to defraud need be alleged under section 11. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983).

Under section 14, a plaintiff states a cause of action by, inter alia, alleging that a defendant "permit[ted] the use of his name" in a proxy solicitation that violated SEC regulations. 15 U.S.C. § 78n. Negligent misrepresentations may form the basis for a claim under section 14. *Wilson v. Great American Industries, Inc.*, 855 F.2d 987, 995 (2d Cir.1988). The exceedingly detailed complaint makes the required allegations.

### C. Applicable Statute of Limitations

Claims under section 11 must be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence," and in any event no later than three years after the securities in question were offered to the public. 15 U.S.C. § 77m. The three-year limitation is absolute, and applies whether or not the investor could have discovered the violation. *Jackson Nat'l Life*, 32 F.3d at 704. The same one year/three year limitations period has been applied to claims under section 14. *Ceres Partners v. GEL Assocs.*, 918 F.2d 349, 363–64 (2d Cir.1990); *Westinghouse Elec. Corp. v. Franklin*, 993 F.2d 349, 353 (3d Cir.1993).

Plaintiffs make little effort to argue that their claims were brought within this time period. Instead, they primarily argue that the statute of limitations set forth in 15 U.S.C. § 77m and the case law cited above has been superseded by the Sarbanes–Oxley Act of 2002, Pub.L. 107–204, § 804(a) (2002). Sarbanes–Oxley amended 28 U.S.C. § 1658, the residual statute of limitations for civil actions arising under acts of Congress, to read, in relevant part:

[A] private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(47)), may be brought not later than the earlier of –

(1) 2 years after the discovery of the facts constituting the violation; or

(2) 5 years after such violation.

28 U.S.C. § 1658(b). If this limitations period applies to the instant claims, they would be unquestionably be timely, since the consolidated complaint was filed within two years of the period in which defendants argue that reasonable investors should have become aware of the alleged fraud, and within five years of the earliest of the transactions at issue. Defendants respond, however, that the extended statute of limitations does not apply here, because the claims at issue are not "claim[s] of fraud, deceit, manipulation, or contrivance," but rather claims of negligent misrepresentation, so the extended limitations period does not apply.[3]

Defendants are correct. The only claims asserted by plaintiffs against these defendants are based on two sections of the securities laws which, as pointed out above and as plaintiffs themselves affirma-

---

**3.** Defendants also argue that the expansion of the statute of limitations does not apply to these claims because section 804(b) of the Act states that it "shall apply to all proceedings addressed by this section that are commenced on or after the date of enactment of this Act," that date being July 30, 2002. Pub.L. No. 107–204 sec. 804(b), 116 Stat. 745, 801 (2002). Defendants claim that this "proceeding" commenced on February 5, 2002, when "the plaintiffs filed their first complaints in this action." (April 2000 Underwriters Mem. 10.) Because the Court agrees with defendants' other reason for finding the Sarbanes–Oxley Act inapplicable, the Court need not consider the more complex issue of whether this "proceeding," which is actually a consolidation of many proceedings commenced by different plaintiffs against different defendants at different times, should be deemed to have been commenced before or after July 30, 2002.

tively argue (P. Mem.43–44.),[4] do not require any showing of fraudulent intent, but establish liability even for negligent representations. But the Sarbanes–Oxley provision on which plaintiffs rely does not broadly expand the statute of limitations for all actions brought under the securities laws, as it could easily have done, but rather "establishe[s] a distinct federal statute of limitations for certain causes of action arising under the securities laws," *Verizon Maryland Inc. v. RCN Telecom Services, Inc.*, 232 F.Supp.2d 539, 553 n. 6 (D.Md.2002), namely those that "involve[ ] a claim of fraud, deceit, manipulation, or contrivance." 28 U.S.C. § 1658. This description of the covered causes of action mirrors the language of section 10(b) of the Exchange Act, which creates liability for "any person" who "employ[s] . . . any manipulative or deceptive device or contri-

vance in contravention of" SEC regulations, 15 U.S.C. § 78j(b), and which thus requires a showing of fraudulent intent, *Herman & MacLean*, 459 U.S. at 382, 103 S.Ct. 683. A cause of action that is based on negligence is not a claim for "fraud, deceit, manipulation, or contrivance," all of which are words connoting deliberate, intentional deception. Therefore, by its plain text, the amendment does not apply to claims under sections 11 and 14.[5] Since the plain text of the statute is unambiguous, resort to analysis of the legislative history is unnecessary. *In re Venture Mortgage Fund, L.P.*, 282 F.3d 185, 188 (2d Cir.2002) ("Legislative history and other tools of interpretation may be relied upon only if the terms of the statute are ambiguous.") (quoting *Lee v. Bankers Trust Co.*, 166 F.3d 540, 544 (2d Cir. 1999)).[6]

**4.** Plaintiffs expressly state, for example, that they "do not allege that the Frontier Defendants are liable for intentional misconduct in connection with [Count II]" (Compl.¶ 730), and emphasize that they "do not allege that the [Frontier or Individual] Defendants are liable for intentionally fraudulent or intentional conduct, and disavow[ ] and disclaim[ ] allegations of fraud in connection with [Counts VII or XIV]." (*id.* ¶¶ 754, 808.) Similarly, Counts XII and XIII expressly disavow for purposes of those claims any allegations in the complaint that "charge the . . . Defendants with intentional or reckless misconduct." (*Id.* ¶¶ 792, 800.)

**5.** The textual arguments made by plaintiffs range from the frivolous to the misleading. Plaintiffs rely on the Act's reference to "the securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934," which they correctly point out include sections 11 and 14. (P. Mem.67.) But their argument rips the phrase from its context, which applies the extended limitations period to lawsuits involving ""a claim of fraud, deceit, manipulation or contrivance in contravention of . . . the securities laws." The reference to the securities laws is necessary, given the provision's placement in Title 28, to establish that the extended limitations period applies to claims of *securities* fraud, and not to

all manner of fraud claims; it does not supersede the explicit restriction of the extended statute to claims of securities *fraud*. And plaintiffs' claim that Sarbanes–Oxley "specifically states that it applies to "misrepresentation" claims (P. Mem. 67 n. 34) is simply inaccurate."

**6.** Although resort to the legislative history is unnecessary in this case because of the statute's unambiguous language, the Court notes, "for the sake of completeness," *United States v. Lucien*, 347 F.3d 45, 51 (2d Cir.2003), that the history here confirms that the provision applies only to securities fraud claims. The single sentence quoted by plaintiffs from the section-by-section analysis of the Sarbanes–Oxley Act placed into the *Congressional Record* by Senator Leahy indeed refers to "all the already existing private causes of action under the various federal securities laws." (P. Opp. 68 (quoting 148 Cong. Rec. S7418).) But plaintiffs' quotation is taken out of context, for the surrounding text refers repeatedly to securities fraud actions. Furthermore, the discussion of the section-by-section analysis placed in the *Congressional Record* by its sponsors reveals that the provision was motivated by considerations involving intentional misrepresentations: specifically, the fact that "[i]n fraud cases the short limitations period

Other district courts have also concluded that the Sarbanes–Oxley modification of the statute of limitations is inapplicable to Section 11 claims. *See In re Merrill Lynch Research Reports Securities Litigation*, 272 F.Supp.2d 243, 265 (S.D.N.Y. 2003) (Pollack, J.); *Friedman v. Rayovac Corp.*, No. 02–C–308–C, slip op. at 3–4 (W.D.Wis. Jun. 20, 2003). Plaintiffs cite no authority to the contrary.

Accordingly, plaintiffs' causes of action against the moving defendants are governed by the one-year/three-year statute of limitations set forth in 15 U.S.C. § 77m and the case law cited above, and not by the two-year/five-year statute set forth in 28 U.S.C. § 1658.

## II. *Statute of Limitations*

All of the moving defendants argue that the claims against them are barred by the applicable statute of limitations. All claims against these defendants were asserted for the very first time in the consolidated amended complaint filed on January 28, 2003. *See Rothman v. Gregor*, 220 F.3d 81, 96 (2d Cir.2000) ("When a plaintiff seeks to add a new defendant in an existing action, the date of the filing of the motion to amend constitutes the date the action was commenced for statute of limitations purposes."). Thus, claims under section 11 or section 14 may not be based on transactions that occurred before January 28, 2000, or on violations that plaintiffs discovered or should have discovered before January 28, 2002. The various defendants make somewhat different limitations arguments regarding different groups of counts.

### A. *Counts II and VII*

■ Plaintiffs' claims regarding the Frontier transaction (Counts II and VII) are time-barred under the three-year absolute limitation. The date of a securities offering for purposes of the three-year limitations period for section 11 claims is the effective date of the registration statement, *Finkel v. Stratton Corp.*, 962 F.2d 169, 173 (2d Cir.1992), and it is an undisputed matter of public record that the registration statement for the GC securities issued in connection with the Frontier transaction was August 5, 1999. Similarly, all the allegedly misleading proxy statements invoked in plaintiffs' section 11 claims were issued before September 9, 1999. Plaintiffs make no attempt to argue that these claims are timely under the three-year limitations period, relying entirely on the argument, rejected above, that the five-year Sarbanes–Oxley statute applies. The claims against defendants Merrill Lynch and Morgan Stanley based on the Frontier transaction (Counts II and VII) must therefore be dismissed.

### B. *Counts XII, XIII and XIV*

The acquisition of IXnet and IPC (which is the subject of Count XIV) and the April 2000 underwriting (which is the subject of Counts XII and XIII) took place in the

under current law is an invitation to take sophisticated steps to conceal the deceit." The provision was viewed by some as a "legislative reversal of the *Lampf* decisions," 148 Cong. Rec. S7420, referring to the Supreme Court's decision in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991), which dealt with the statute of limitations for private actions under section 10(b) of the Securities Act. *See id.* at 358–59, 111 S.Ct. 2773 ("[W]e are faced with the awkward task of discerning the limitations period that Congress intended courts to apply to a cause of action it really never knew existed."). That section 804 of Sarbanes–Oxley legislatively establishes a limitations period where none had previously been provided for by statute may also explain why Congress created a new provision within 28 U.S.C. § 1658, rather than simply amending the existing statute of limitations provisions already incorporated in 15 U.S.C. § 77m, which Sarbanes–Oxley pointedly left in place.

spring of 2000, and claims relating to those transactions are not barred by the three-year absolute limitations period. The April 2000 underwriters and DLJ claim, however, that those claims are barred by the one-year statute of limitations, since plaintiffs were on notice of the fraudulent accounting practices of which they complain at the latest by the end of 2001, more than one year before these claims were first asserted.

The Second Circuit recently summarized the law governing application of the one-year discovery limitations period:

> The one-year limitations period begins to run after the plaintiff "obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge." *Kahn v. Kohlberg, Kravis, Roberts & Co.,* 970 F.2d 1030, 1042 (2d Cir.1992). Furthermore, "when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises." *Dodds v. Cigna Secs., Inc.,* 12 F.3d 346, 350 (2d Cir.1993). The circumstances that give rise to a duty of inquiry are often referred to as "storm warnings." *Id.* Once a plaintiff receives these "storm warnings" and a duty of inquiry arises, "knowledge will be imputed to the investor who does not make such an inquiry." *Id.* Moreover, whether the securities fraud claim of a person who receives "storm warnings" is time barred "turns on *when,* after obtaining inquiry notice," the plaintiff "in the exercise of reasonable diligence, should have discovered the facts underlying the [defendant's] alleged fraud." *Rothman v. Gregor,* 220 F.3d 81, 97 (2d Cir.2000).

*Levitt v. Bear, Stearns & Co.,* 340 F.3d 94, 101 (2d Cir.2003).

■■ Whether a plaintiff "should have" discovered a misrepresentation or omission is an objective determination. *Newman v. Warnaco Group, Inc.,* 335 F.3d 187, 193 (2d Cir.2003); *Armstrong v. McAlpin,* 699 F.2d 79, 88 (2d Cir.1983). It can be resolved at the dismissal stage if "the facts needed . . . can be gleaned from the complaint and papers . . . integral to the complaint." *LC Capital Partners, LP v. Frontier Ins. Group, Inc.,* 318 F.3d 148, 156 (2d Cir.2003), quoting *Dodds v. Cigna Securities, Inc.,* 12 F.3d 346, 352 n. 3 (2d Cir. 1993). On the other hand, the question of whether a plaintiff exercised due diligence is "usually a question of fact for the jury to decide." *In re Integrated Resources Real Estate Limited Partnerships Securities Litig.,* 815 F.Supp. 620, 638 (S.D.N.Y. 1993). "Issues of due diligence and constructive knowledge depend on inferences drawn from the facts of each particular case—similar to the type of inferences which must be drawn in determining intent and good faith, [and w]hen conflicting inferences can be drawn from the facts, . . . summary judgment is inappropriate." *Robertson v. Seidman & Seidman,* 609 F.2d 583, 591 (2d Cir.1979) (citations omitted). A fortiori, caution is warranted in approaching a motion for judgment on the pleadings on such issues.

To avoid dismissal, plaintiffs must allege facts that would establish, drawing all reasonable inferences in their favor, that they neither discovered nor should have discovered "by the exercise of reasonable diligence" the alleged misrepresentations of these defendants more than one year before claims were first asserted against them on January 28, 2003. 15 U.S.C. § 77m. Defendants claim that plaintiffs' duty to inquire had arisen by late 2001, pointing to several news articles published at that time and cited in the complaint, and to the "stead[y]" drop in the price of GC stock "throughout the fall and winter of 2001." (April 2000 Underwriters Mem. 14–16.)

Because of their misguided reliance on the longer Sarbanes–Oxley statute of limitations, plaintiffs make only a passing attempt to show that they could meet the one-year limitation, stating that "the Bank Defendants still have failed to show that plaintiffs were on inquiry notice prior to January 28, 2002 [when] Global Crossing filed for bankruptcy" (P. Opp. 69 n. 35), and that "plaintiffs had no way of knowing about the fraud at Global Crossing until Roy Olofson ... stepped forward publicly on January 29, 2002." (*Id.* at 71.)

■ Plaintiffs' claim that reasonable investors were not at least on inquiry notice of GC's fraudulent accounting practices before the bankruptcy filing is preposterous. As plaintiffs acknowledge, a *Fortune* magazine article about the "fall of much-hyped Global Crossing," published on December 24, 2001, and referenced in the complaint, provided earlier notice that something was amiss at GC. (*Id.* 71–72.) Indeed, the Court finds that the article suggests that *much* was amiss and that this article by itself provided the required "storm warning"—knowledge of "circumstances [suggesting] to an investor of ordinary intelligence the probability that she has been defrauded"—that constitutes inquiry notice.[7] *Dodds*, 12 F.3d at 350. The article did not merely indicate general financial difficulties at GC; rather, it laid out in detail precisely the transactions at the heart of plaintiffs' allegations of accounting fraud, revealing that much of Global Crossing's revenue was coming from unneeded capacity swaps, and that key information was not shared with stockholders:

Global Crossing has plenty of company in its misery ...

With their business plans stymied, some of the new carriers have looked to a new source of revenues – each other.

Telcos often swap capacity to fill in gaps in their networks, usually in the form of long-term leases for use of a stretch of fiber. The company leasing out its fiber records the transaction as a sale, and the company paying for the fiber records the purchase as a capital expenditure. Most of the deals are perfectly kosher. But some analysts charge that telcos have entered into mirror transactions for buying and selling capacity never used to carry paying traffic, thus using capital expenditures to pump up each other's revenues. What is more, by booking their costs as capital expenses – which are amortizable over a number of years – they boost current earnings as well. "It had the appearance of a Ponzi scheme or shell game," says Rob Rock, a fixed-income analyst at John Hancock mutual funds. "The question is, Was there an end user for all this capacity, or were they just manufacturing revenue?" Rock worries that in some cases the answer was clearly the latter.

[Global Crossing's CEO John] Legere admits that telcos left investors in the dark about the deals. "The industry gave no information," he says. "We showed a huge cash number, but we didn't answer questions about price, supply, capacity, or the number of units." While he won't say the practice was wrong, he does allow that shareholders may have been confused about the robustness of revenues. This year lease payments from rivals will account for about $1.6 billion of Global Crossing's revenues. When asked how Global Crossing used capacity it bought from rivals – at a cost of about $1.3 billion this year – Legere says he doesn't know

---

7. A single published article can be sufficient to provide inquiry notice. *See In re Ultrafem Inc. Securities Litigation,* 91 F.Supp.2d 678, 692 (S.D.N.Y.2000); *Sterlin v. Biomune Systems,* 154 F.3d 1191, 1202–04 (10th Cir.1998).

the specifics of deals completed before he arrived.

Julie Creswell, "Global Flameout; Chairman Gary Winnick Spent Like a Roman Emperor. But the Fall of Much–Hyped Global Crossing Spells Trouble for Other Telcos Too," *Fortune,* Dec. 24, 2001, at 109.

■ Plaintiffs attempt to raise a factual issue by claiming that the *Fortune* article did not adequately put them on inquiry notice because "the . . . disclosures say nothing about the pre-July 1999 mismatch of costs to revenues, the Hindery memo, the flouting of APB 29, the misleading nature of Global Crossing's disclosures about FIN 43, creation of the deceptive measurements of 'cash revenue' and 'adjusted EBITDA' or the last minute, end of quarter swaps for economically worthless assets." (P. Opp.72.) Plaintiffs do not explain why, absent these details, the *Fortune* article did not trigger a duty to inquire. More importantly, this argument is legally insufficient, as "[a]n investor does not have to have notice of the entire fraud being perpetrated to be on inquiry notice." *Dodds,* 12 F.3d at 352; *see also Anixter v. Home–Stake Production Co.,* 939 F.2d 1420, 1438 (10th Cir.1991) (stating, in section 11 case, that "Appellants need not . . . have fully discovered the nature and extent of the fraud before they were on notice that something may have been amiss. Inquiry notice is triggered by evidence of the possibility of fraud, not full exposition of the scam itself" (quoting *Kennedy v. Josephthal & Co.,* 814 F.2d 798, 802 (1st Cir.1987))). As has been stated in the context of securities fraud cases, "the statute is not tolled for a plaintiff's 'leisurely discovery of the full details of the alleged scheme.' Instead, the period runs from the time at which a plaintiff 'should have discovered the general fraudulent scheme.' " *In re Integrated Resources,* 815 F.Supp. at 637 (quoting *Klein v. Bower,* 421 F.2d 338, 343 (2d Cir.1970) and

*Robertson v. Seidman & Seidman,* 609 F.2d at 587).

While the *Fortune* article alone would have put a reasonable investor on notice that the GC's financial statements, which were at the heart of the registration and proxy statements at issue in the claims here, were fraudulently overstated, it hardly stood alone as a harbinger of fraud. By October 2001, it was apparent both that GC was in a state of collapse, and that its sudden decline stemmed from underlying weaknesses that had been fraudulently concealed. As of October 4, 2001, the stock issued in April 2000 was trading at 10% of the offering price, following a 50% drop in a single day. (Compl. ¶¶ 497–498; Simmons Decl. Ex. 8.) While a decline in stock value is not in itself proof of fraud, the Second Circuit has noted that such declines "should have put [a reasonable investor] on notice of fraud." *Berry Petroleum Co. v. Adams & Peck,* 518 F.2d 402, 411 (2d Cir.1975); *see also de la Fuente v. DCI Telecommunications, Inc.,* 206 F.R.D. 369, 382–83 (S.D.N.Y.2002) (holding drop in stock price was one of several storm warnings sufficient to put plaintiff on notice of fraud).

The fall in the stock price was neither unexplained nor unaccompanied by other indicia of fraud. The October collapse followed immediately upon a press release announcing the company's fourth change of CEO in three years, and a likely shortfall of third quarter revenues "due primarily to a sharp falloff in [IRU] sales." (Compl.¶ 497.) The complaint itself acknowledges that by early October 2001 "market observers . . . characterized the company as 'looking shaky' and *questioned Global Crossing's ability to continue as a going concern."* (Compl. ¶ 690; emphasis in original.) According to plaintiffs, "[b]etween October 4 and 5, Global Crossing issued a series of announcements calling

into question its ability to continue operating with[out] filing for bankruptcy." (*Id.* ¶ 692.) The plaintiffs quote an October 15, 2001, interview in which the incoming CEO stated that "[t]he IRU business has always been somewhat of a mystery," and that "[w]e're going to lay out a plan and stop this charade." (*Id.* ¶ 503.)

When a company that has touted its rosy financial picture sees its stock prices plummet by over 90%, suddenly finds itself in danger of bankruptcy, and refers through its CEO to a principal source of its reported profitability as a "mystery" and a "charade," it is fatuous to claim that the circumstances would not "suggest to an investor of ordinary intelligence the probability that she has been defrauded." *Dodds*, 12 F.3d at 350.

Defendants contend that this conclusion ends the inquiry. They argue that the statute of limitations began to run as of the time when the plaintiffs were on inquiry notice, and that, since the claims against DLJ and the April 2000 underwriters were not brought until more than a year after such inquiry notice was obtained, those claims are time-barred. Plaintiffs, on the other hand, argue that the statute of limitations begins to run "from the date on which a plaintiff should have *actually* discovered the facts underlying the alleged fraud," not from the date of any "inquiry notice." (P. Mem.69.)

The disagreement is rooted in a distinction made in the relevant caselaw. Inquiry notice is tantamount to actual discovery of a fraud when a plaintiff, having received knowledge sufficient to trigger a diligent investigation, fails to inquire into the facts. "[W]here the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation,

knowledge of the fraud will be imputed to him." *Higgins v. Crouse*, 147 N.Y. 411, 416, 42 N.E. 6 (1895), quoted with approval in *Armstrong*, 699 F.2d at 88. On the other hand, "if, after the duty to inquire arises, the investor does indeed inquire," it is necessary to determine when the investor would have been able to acquire sufficient information to file suit. *Rothman*, 220 F.3d at 97.

Defendants argue that the time when actual discovery would have occurred is only relevant when plaintiffs actually investigate after receiving inquiry notice: "If the investor makes no inquiry once the duty arises, knowledge will be imputed as of the date the duty arose." *LC Capital Partners*, 318 F.3d at 154. They point out that plaintiffs have not alleged, in either the complaint or their motion papers, that they made a diligent effort to undertake any kind of investigation of Global Crossing's finances prior to January 28, 2002, and note that the Second Circuit stated in *LC Capital Partners* that, "[o]nce the facts on the face of the complaint and related documents give rise to a duty of inquiry, it is appropriate to require a plaintiff . . . at least to allege that inquiry was made." *Id.* at 156.

But *LC Capital Partners* is distinguishable, and defendants' effort to erect the Court's statement in that case into an iron rule of pleading is unpersuasive. In *LC Capital Partners*, the plaintiff "concede[d] that it made no inquiry until . . . more than a year after the duty of inquiry arose." *Id.* In this case, by contrast, the earliest of plaintiffs' actions against GC directors and others was filed on February 5, 2002, within a few days of the GC bankruptcy and a mere four months after the earliest date on which defendants contend a duty of inquiry could have arisen. While the consolidated amended complaint does not explicitly allege that the plaintiffs un-

dertook an investigation of the fraud they now allege, that complaint, in all its massive detail, is persuasive evidence that a lengthy and complicated investigation into the details of GC's activities and its relationship with various investment bankers, auditors, and other parties was indeed undertaken. The record of the case reveals, moreover, that plaintiffs sought to pursue discovery from the first conference in the case (and were met with objections founded on the automatic discovery stay imposed by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub.L. No. 104–67, 109 Stat. 737 (1995)), and that adjournments of the deadline to file a consolidated amended complaint were predicated on their need to secure documents available from various public sources. Whether or not alleged in the complaint, it is fully apparent that plaintiffs were vigorously investigating the alleged fraud no later than the time of GC's bankruptcy filing on January 28, 2003.

Thus, unlike the plaintiffs in *LC Capital Partners*, who waited a year after being put on inquiry notice to take action, the plaintiffs here began to investigate at a minimum within a few months after inquiry notice arose. Even if it is assumed, in the absence of a pleading to the contrary, that plaintiffs did nothing affirmative between October 4, 2002, and January 28, 2003, to investigate GC's finances, it is hardly rational to conclude that such a brief period of slumber entails treating the earliest "storm warning" as equivalent to constructive knowledge of the entire fraud for statute of limitations purposes. The last months preceding GC's bankruptcy, as is often the case in highly-publicized financial scandals, were a period of escalating press attention, culminating in the *Fortune* article, published on Christmas Eve, 2003. Investors can hardly be faulted for pausing to see what additional disclosures would appear before undertaking their own investigation into GC's accounting. Such a

delay accords with the policies of the securities laws: "[T]he applicable statute of limitations should not precipitate groundless or premature suits by requiring plaintiffs to file suit before they can discover with the exercise of reasonable diligence the necessary facts to support their claims." *Sterlin v. Biomune Systems*, 154 F.3d 1191, 1202 (10th Cir.1998), quoted with approval in *Rothman*, 220 F.3d at 97. "It makes little sense from a policy perspective to require specific factual allegations—on pain of dismissal in cases of this sort—and then to punish the pleader for waiting until the appropriate factual information can be gathered by dismissing the complaint as time barred." *Levitt*, 340 F.3d at 104.

▆ Thus, on the face of the complaint and the public record of this case, plaintiffs here cannot be found to have slept in the face of inquiry notice. At a minimum, a question of fact is presented as to whether plaintiffs acted with reasonable diligence in briefly delaying the start of their investigation (if indeed, they did not undertake such investigation before January 28, 2003). Under such circumstances, as the Court of Appeals held in *Rothman*, buttressed by repeated italicized quotations from earlier cases emphasizing that the limitations period begins when a "reasonable investor of ordinary intelligence *would have discovered* the existence of the fraud," the inquiry "turns on *when*, after obtaining inquiry notice, . . . the [plaintiffs] should have discovered the facts underlying the alleged" misstatements by the defendants. 220 F.3d at 97 (quoting *Dodds*, 12 F.3d at 350, and citing *Henley v. Slone*, 961 F.2d 23, 24 (2d Cir.1992) (emphasis supplied in *Rothman* )).

This is not a determination that can be made on the face of the pleadings. It is certainly plausible to believe that, even had a diligent investigation been com-

menced on October 4, 2001, it would have taken a minimum of several months for plaintiffs to unravel the complex accounting machinations that form the basis of the complaint. Moreover, even after the facts regarding GC's fraudulent accounting were known, further investigation would be required to examine the various transactions and associated financial filings on which the present causes of action against secondary parties such as DLJ and the April 2000 underwriters are based, and to determine whether those parties acted with the requisite culpability. As the Court of Appeals noted in *Levitt*, since "a person can be liable for securities fraud only if he violates the statute himself," in seeking to bring suit against a secondary party, even once plaintiffs were on inquiry notice that they had been defrauded, "they were required to exercise reasonable diligence in discovering the facts establishing" liability on the part of the secondary actors. 340 F.3d at 103. Since the statute of limitations begins to run, in the case of investors who undertook a reasonable effort of inquiry once "storm warnings" had been posted, when a reasonable investor would have discovered the facts necessary to bring the cause of action, it is a question of fact for ultimate resolution at trial (or on summary judgment if the factual record permits only one conclusion) whether plaintiffs in the exercise of reasonable diligence would have discovered the facts underlying the present claim more than one year before those claims were asserted on January 28, 2003. Accordingly, the motions to dismiss Counts XII, XIII and XIV on statute of limitations grounds is denied.

## III. *Standing*

The April 2000 underwriters also move to dismiss Counts XII and XIII on grounds of standing.

### A. *Count XIII*

Defendants argue that plaintiffs lack standing to bring a section 11 claim with reference to the April 2000 offering of 6¾% preferred shares. First, they contend that the only named plaintiff alleged to have purchased any of these shares, B.I. Shuster (*see* Compl. ¶ 15), is not one of the Lead Plaintiffs appointed by the Court pursuant to the PSLRA. *See* Order dated 12/13/02, Appointment of Lead Plaintiff and Organization of Counsel (entered 12/18/02). According to defendants, the addition of Shuster as a named plaintiff in the consolidated amended complaint constitutes an illegitimate "attempt to appoint Shuster as a lead plaintiff" and "an improper encroachment on this Court's authority and duty under the PSLRA" to appoint lead plaintiffs. (April 2000 Br. at 23.)

■ This argument, essentially abandoned by defendants in their reply brief, is without merit. Under the PSLRA, the Court appoints appropriate plaintiffs, presumptively those seeking the responsibility who have the largest losses, 15 U.S.C. § 78u–4(a)(3)(B)(iii), to undertake the selection of lead counsel and the management of the direction of the litigation. But nothing in the PSLRA requires that the lead plaintiffs have standing to assert all of the claims that may be made on behalf of all of the potential classes and subclasses of holders of different categories of security at issue in the case. Indeed, the imposition of any such requirement would be at odds with the purposes of the statute, since in the case of large alleged frauds involving issuers of many classes of securities, the consequence would be either the appointment of a large number of lead plaintiffs (undermining the goal of a cohesive leadership and management group) or the premature breakdown of the action into an unmanageable number of separate

cases brought by different lead plaintiffs on behalf of each potential subclass of securities holders.

Nor does anything in the PSLRA prevent the Lead Plaintiffs from constructing a consolidated complaint that brings claims on behalf of a number of named parties besides the Lead Plaintiffs themselves. That is all that has been done here. In conducting the lawsuit on behalf of all class members and all those who have brought complaints that have been consolidated under their leadership, Lead Plaintiffs have a responsibility to identify and include named plaintiffs who have standing to represent the various potential subclasses of plaintiff who may be determined, at the class certification stage, to have distinct interests or claims. By naming additional plaintiffs who, as purchasers of different categories of securities, have standing to bring claims on behalf of the various potential subclasses of securities purchasers, the Lead Plaintiffs in this case have simply exercised that responsibility.

The complaint does not purport to add Shuster to the list of Lead Plaintiffs appointed by the Court, or to assign him any of the responsibilities that devolve upon lead plaintiffs under the PSLRA. It merely identifies him, along with a number of other plaintiffs besides the Lead Plaintiffs, as one of the plaintiffs in the case who alleges he has been aggrieved by the acts of the defendants. Judges presiding over complex securities class actions under the PSLRA have repeatedly rejected arguments, like those defendants raise here, that seek to confuse the role of lead plaintiffs under the PSLRA with that of named plaintiffs for purposes of ordinary class action standing law, or to claim that the individual lead plaintiff must have standing to bring all of the claims asserted in the class action complaint. *See In re Initial Public Offering Securities Litig.*, 214 F.R.D. 117, 122–23 (S.D.N.Y.2002); *In re*

*Enron Corp. Securities, Derivative & ERISA Litig.*, 258 F.Supp.2d 576, 609–11 (S.D.Tex.2003); *In re WorldCom Inc. Securities Litig.*, No. 02–3288, 2003 WL 21219049 at *26–28 (S.D.N.Y. May 19, 2003).

Second, defendants argue that Shuster does not in any case have standing to bring section 11 claims regarding the April 2000 offering, because he did not purchase his preferred shares until March 2001, by which time, defendants claim, any reasonable purchaser should have been aware of the inaccuracy of GC's registration statements. This argument is also unavailing.

Under section 11, "any person acquiring" a security issued pursuant to an inaccurate registration statement may bring an action against those responsible for the misstatements. 15 U.S.C. § 77k(a). The only relevant exception is that the action will be defeated if "it is proved that at the time of such acquisition he knew of such untruth or omission." *Id.* Essentially, defendants assert as a matter of fact that by eleven months after the issuance of the registration statements, when he acquired his shares, Shuster must, as a reasonable investor aware of the already-sharply-declining GC share price, have been aware of the inaccuracy of the registration statement.

 Whether Shuster knew of the erroneous statements in the registration statement is a factual issue. Moreover, it is one on which the defendants effectively bear the burden of proof. Section 11 provides that any person acquiring a security registered pursuant to a misleading registration statement may sue "unless *it is proved*" that he knew of the untruth of the statement at the time he made the purchase. 15 U.S.C. § 77k(a) (emphasis added). At this stage of the proceedings, then, it is presumed that the purchasing plaintiff did not know of the false or mis-

leading statements. Perhaps there are cases in which the facts pled demonstrate that the purchaser must have known the truth, but this is clearly not one of them. The only fact to which defendants point in making this argument is that the price of GC securities has already fallen by the time Shuster bought his shares. This may or may not have alerted a purchaser that there was some risk or problem associated with the securities, but a declining share price alone would not have demonstrated the falsity of any particular assertion in the registration statement, and defendants do not suggest any evidence, still less any portion of the plaintiffs' pleading, indicating that the facts about GC's accounting fraud were known as early as March 2001.

 Finally, in a closely related argument, defendants argue that Shuster did not purchase his shares pursuant to the erroneous registration statement. This argument, for which no plausible authority is cited, appears to be an attempt to revive the universally rejected claim that only those who purchased stock in the initial offering, and not aftermarket purchasers, are entitled to sue under section 11. Every appellate court to have considered that argument, including the Second Circuit, has rejected it based on the plain language of section 11. *See DeMaria v. Andersen*, 318 F.3d 170, 175–78 (2d Cir.2003); *Lee v. Ernst & Young, LLP*, 294 F.3d 969, 976–78 (8th Cir.2002); *Joseph v. Wiles*, 223 F.3d 1155, 1158–61 (10th Cir.2000); *Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1080–82 (9th Cir.1999). Contrary to defendants' argument, the Second Circuit expressly ruled that "[i]n a case such as this one, where there has been only one stock offering, any person who acquires the security may sue under § 11, 'regardless of whether he bought in the initial offering, a week later, or a month after that.'" *De-Maria*, 318 F.3d at 176, quoting *Hertzberg*, 191 F.3d at 1080. As defendants concede (R. Mem. at 10), there was only one offer-

ing of 6¾ % preferred shares, and so there is no question that Shuster's shares are traceable to that offering. Defendants' claim that it is "absurd" to think that Shuster relied on the registration (Mem. at 25) is legally irrelevant, since reliance is not an element of a section 11 claim for any purchaser who bought securities within twelve months of the registration statement. 15 U.S.C. § 77k(a); *In re WorldCom*, 2003 WL 21219049 at *11; *Schwartz v. Celestial Seasonings, Inc.*, 904 F.Supp. 1191, 1196 (D.Colo.1995).

Accordingly, the claim that plaintiffs lack standing to assert a section 11 claim regarding the 6¾ % offering is rejected.

### B. *Count XII*

 Defendants raise a more troubling standing argument with respect to Count XII. The April 2000 stock issue was a secondary offering of GC common stock. As defendants point out (and as the Court may take judicial notice of, since the facts are based on public SEC filings), the shares offered in April 2000 represented only 5.5% of the total number of GC shares then outstanding. While, as noted above, the law is clear that purchasers of securities issued pursuant to a misleading registration statement can assert a section 11 claim whether they purchase their shares directly in the public offering or in the general securities markets, it is equally clear that they may only sue "so long as the security was indeed issued under *that* registration statement and not another." *Lee*, 294 F.3d at 976–77, quoted in *DeMaria*, 318 F.3d at 176. Thus, it has been established in the Second Circuit since *Barnes v. Osofsky*, 373 F.2d 269 (2d Cir. 1967) (Friendly, J.), that to have standing to assert a section 11 claim, plaintiffs must be able to "trace their shares to an allegedly misleading registration statement." *DeMaria*, 318 F.3d at 176.

Plaintiffs claim that they have satisfied this requirement, since they clearly assert that they seek to bring their action only "on behalf of those who purchased or otherwise acquired Global Crossing common stock traceable to the Secondary Offering and pursuant to the Registration Statement and Prospectus filed in conjunction with the April 3, 2000 shelf offering." (Compl.¶ 793.) More, however, is required. It is well established that a plaintiff seeking to represent a class must be a member of the class he purports to represent. *See, e.g., Bailey v. Patterson*, 369 U.S. 31, 32–33, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962); *Nat'l Super Spuds, Inc. v. Mercantile Exchange*, 660 F.2d 9, 17 (2d Cir.1981). Thus, it is not enough that plaintiffs seek damages only for a class that has standing; at least one named plaintiff must be a member of that class—that is, a named plaintiff must have purchased shares traceable to the challenged offering.

Nowhere in the complaint is it alleged that any named plaintiff meets this requirement. At most, plaintiffs allege that various named plaintiffs purchased securities during the class period (Compl.¶¶ 9, 12); they also cite the Lead Plaintiffs' certification (referenced in the complaint), which shows that the Lead Plaintiffs purchased substantial numbers of GC shares within weeks of the Secondary Offering. (P. Mem. at 54 & n. 26.) But they cite no portion of the voluminous complaint, or any document referenced in it, that establishes that any named plaintiff can trace his, her or its shares to that offering.

The Second Circuit has not directly addressed whether plaintiffs asserting a section 11 claim must explicitly plead that they purchased shares traceable to the flawed registration statement. In *Barnes*, the issue was simply whether class members participating in a settlement fund needed to prove that their shares were traceable; in *DeMaria*, since there was only one offering of the relevant securities, the issue of tracing did not arise. Nevertheless, those district courts that have considered the question have required plaintiffs to plead as well as prove that their shares were issued pursuant to the misleading registration statement. *See Ciresi v. Citicorp.*, 782 F.Supp. 819, 823 (S.D.N.Y. 1991) (dismissing class action complaint where there had been more than one offering, and plaintiffs failed to allege they purchased shares issued pursuant to allegedly false registration statement); *Lorber v. Beebe*, 407 F.Supp. 279, 286–87 (S.D.N.Y.1975) (same); *Guenther v. Cooper Life Sciences, Inc.*, 759 F.Supp. 1437, 1440–41 (N.D.Cal.1990) (same); *McFarland v. Memorex Corp.*, 493 F.Supp. 631, 641–42 (N.D.Cal.1980) (same); *Lilley v. Charren*, 936 F.Supp. 708, 718 (N.D.Cal. 1996) (same).

These decisions appear correct. It is clear that plaintiffs bear the burden of proving securities are traceable. *Barnes*, 373 F.2d at 273 n. 2; *Lorber*, 407 F.Supp. at 286; *Kirkwood v. Taylor*, 590 F.Supp. 1375, 1382–83 (D.Minn.1984) (on motion for summary judgment). Moreover, the tracing requirement is essential to the cause of action. Stocks are not fungible under section 11. *Barnes*, 373 F.2d at 272–73 (2d Cir.1967). Only those who purchase securities that are subject to allegedly false registration statement, and not those who buy identical stocks already being traded, can sue under section 11. *Id.; Wolfson v. Solomon*, 54 F.R.D. 584, 588 (S.D.N.Y.1972); *Guenther*, 759 F.Supp. at 1440–41; *see also DeMaria*, 318 F.3d at 176 (citing *Barnes* and *Lee v. Ernst & Young*, 294 F.3d at 976–77). The cause of action inheres in the faulty registration statement that put the shares in question on the market; it is on the basis of the flaw in the underlying registration that section 11 dispenses with the require-

ments of scienter, and, for those who purchase soon enough after the registration statement, reliance. Those who purchased in the open market shares that were properly registered in an earlier offering are relegated to the securities fraud remedies that include such requirements. Thus, plaintiffs who purchased securities not issued pursuant to the misleading registration statement lack standing as surely as the purchasers of other securities entirely.

As Judge Friendly noted more than 35 years ago, modern market conditions may have made the tracing requirement obsolete. *See Barnes,* 373 F.2d at 273. In a world in which the "shares" purchased by a stockholder might be merely electronic entries in a brokerage firms' books, tracing may be impracticable; at a minimum, as the Third Circuit more recently noted, "[b]efore discovery takes place, [it may be] impossible for plaintiffs to know whether their shares were newly issued or were purchased in the secondary market." *Shapiro v. UJB Financial Corp.,* 964 F.2d 272, 286 (3d Cir.1992). For these reasons, the pleading requirement is not elaborate. Plaintiffs have not been required to explain how their shares can be traced; general allegations that plaintiff purchased "pursuant to" or traceable to false registration statement have been held sufficient to state a claim. *Shapiro,* 964 F.2d at 285–86; *In re Crazy Eddie Securities Litig.,* 747 F.Supp. 850, 854–55 (E.D.N.Y. 1990); *In re AES Corp. Securities Litig.,* 825 F.Supp. 578, 592 (S.D.N.Y.1993); *Neuberger v. Shapiro,* Fed. Sec. L. Rep. 90,-261, 1998 WL 408877at *2 (E.D.Pa. July 17, 1998). But absent any such allegation,

the named plaintiffs lack standing to assert a claim pursuant to section 11, and therefore to represent the class of purchasers of GC common stock traceable to that offering. Accordingly, Count XII must be dismissed as currently pled, with leave to plaintiffs to replead should they have a good faith basis for believing that some of their shares were or must have been issued pursuant to the April 2000 offering.

## IV. *DLJ's Fairness Opinion*

DLJ argues that Count XIV, relating to the IXnet/IPC merger, should be dismissed as to DLJ for failure to state a claim. As to DLJ's involvement in that transaction, the complaint alleges only that DLJ "issued fairness opinions" to IXnet/IPC opining "that the stock exchange ratio was fair to the IXnet and IPC shareholders from a financial point of view," and consented to the inclusion of those opinions in the IXnet/IPC registration statement. (Comp.¶¶ 359, 361, 809, 811.) Plaintiffs maintain that the registration statement was thus rendered inaccurate, because the overvaluation of GC stock due to its inaccurate financial statements rendered the exchange anything but fair.

Certain of DLJ's arguments may be quickly dismissed. DLJ argues that any inaccuracy in its fairness opinion could not have been material to purchasers of GC shares issued pursuant to the IXnet/IPC registration statement, since that opinion was only a minor part of the total information package, and related only to the relative value of the shares of GC and IXnet/IPC, not the absolute value of GC shares themselves.[8] More cynically, it

---

8. DLJ appears to assume that the acquired company's financial statements may have been just as bogus as GC's, and that plaintiffs are to be faulted for not alleging the specific impact of the inaccurate valuation of GC shares as against the true value of the acquired company's shares. (DLJ Mem. at 8.) There is no reason for the Court to make this assumption; if the valuation of GC shares was inflated by inaccurate accounting procedures, as plaintiffs profusely allege, it is a logical inference that an exchange ratio that was assertedly fair on the basis of the inflated stock value was not fair in light of the true value of the shares.

contends that the alleged falsity of its opinion could not hurt purchasers of GC shares, since the acquisition of IXnet/IPC with overvalued GC stock could only have raised the shareholder value of GC.

These arguments are without merit. They all go to the materiality of any alleged misstatement, which is a question of fact that cannot be resolved so easily on the pleadings. *TSC Indus. v. Northway,* 426 U.S. 438, 450, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). Count XIV is not brought by or on behalf of anyone who acquired GC shares issued pursuant to the IXnet/IPC registration statement, but only by and on behalf of IXnet/IPC shareholders who obtained shares in the merger itself by exchanging their shares in the acquired companies. (Compl.¶ 810.) It is difficult to see how an opinion about the fairness of the exchange ratio could be other than material to those shareholders.

DLJ's argument that it is not subject to the provisions of section 11 is no more persuasive. Section 11 applies to

> every accountant, engineer, or appraiser, or any *person whose profession gives authority to a statement made by him,* who has with his consent been named as having prepared or certified any part of the registration statement, or as *having prepared or certified any report or valuation* which is used in connection with the registration statement, with respect to the statement ... which purports to have been prepared or certified by him.

15 U.S.C. § 77k(a)(4). DLJ queries whether it is a "person whose profession gives authority to a statement made by him," and denies that its opinion letters are "reports of valuations." (DLJ Mem. at 15.) But DLJ's opinion letters affirmatively tout its professional expertise as a reason to take its opinion as authoritative (Ogden Decl. Ex. A at D–1–2, D–2–2), and a reasonable factfinder could easily conclude that a letter from a professedly expert appraiser of business transactions opining that a particular exchange ratio for securities of two companies is fair, delivered to the shareholders of one side of the transaction and deliberately included in the registration statement of the securities to be issued in connection with the deal, constitutes a "report or valuation ... used in connection with [a] registration statement."

DLJ's more serious argument, however, is that the complaint does not actually allege that the opinion letters were false. The letters are carefully hedged as to the opinion being given, and quite explicit as to the nature of the investigation upon which the opinion is based.[9] With respect to the value of GC shares, DLJ represents only that it has "reviewed financial and other information that was publicly available or furnished to us by [the parties, including] Global Crossing, including information provided during discussions with their respective managements, such as certain financial projections of [Global Crossing] for the five years 2000–2004 prepared by the management of Global Crossing." (Ogden Decl. Ex. A at annex D–1–1, D–2–1.) DLJ specifically states that in rendering its opinion, "we have relied upon and assumed the accuracy and completeness of all of the financial and other information that was available to us from public sources [or]

9. DLJ offers this as yet another reason why the opinions are not material. But that, again, is a question of fact. A skeptic might well question why anyone would pay huge fees for an opinion that its proponent later dismisses as so hedged as to be meaningless, but the directors of IXnet and IPC appear to have found it worthwhile to solicit just such an opinion, and GC sought and obtained DLJ's consent to include the opinion letters in the registration materials. However useless DLJ now claims its services were, a reasonable factfinder could find its opinions material.

that was provided to us by ... Global Crossing or their ... representatives" (*id.* at annex D–1–1, D–2–1—D–2–2) and that "[w]e have not assumed any responsibility for making an independent evaluation of any assets or liabilities or for making any independent verification of any of the information reviewed by us." (*Id.* at annex D–1–2, D–2–2.)

■ Thus, DLJ's statement is quite clear that it is offering only its opinion of the fairness of the exchange ratio, based on the financial information provided by GC. That does not mean that DLJ is exempt from liability for false statements under section 11. Materially misleading statements of opinion and belief can be actionable under the securities laws, where the party offering the opinion misrepresents its true belief, that is, where the opinion or belief is not truly held. *See Virginia Bankshares Inc. v. Sandberg,* 501 U.S. 1083, 1095, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991); *Shields v. Citytrust Bancorp Inc.,* 25 F.3d 1124, 1131 (2d Cir. 1994); *Freedman v. Value Health Inc.,* 135 F.Supp.2d 317, 337 (D.Conn.2001) (decided under § 11).

■ Plaintiffs, however, nowhere allege that DLJ was aware that its purported opinion about the fairness of the transaction was wrong, or that it was based on faulty information, or that DLJ was privy to information known to GC executives that would have undermined the financial information on which DLJ purported to rely. Count XIV alleges that the registration statement was misleading, incorporating the many allegations of the complaint claiming that GC's financial information was false. (Compl.¶ 811.) It further represents that DLJ "consented to the use of its fairness opinions" in the registration statement, and that none of the Count XIV defendants, presumably including DLJ, "made a reasonable investigation or possessed reasonable grounds for the belief

that the statements contained in the IXnet Registration Statement were true ... and were not misleading." (*Id.*) But DLJ had not purported to make a reasonable investigation of the financial information provided by GC. To the contrary, it expressly revealed that it had taken the information provided by GC at face value, and opined only that, *if that information was true,* the exchange ratio was fair. Plaintiffs do not allege that DLJ knew that the information provided by GC was false, or that it misstated in any way its opinion that the exchange ratio was fair based on that information. If the fairness opinion was misleading about the true state of DLJ's information, in other words, it would be actionable, but plaintiffs do not allege that the statements DLJ made about its beliefs were in fact inaccurate.

Plaintiffs make no credible response to this argument. In their brief, plaintiffs claim that DLJ "purported to conduct a due diligence investigation in support of its fairness opinions," that it should be found liable under section 11 "for falsely representing that it had independently assessed the value" of GC, and that it "represented falsely that it had some basis to believe that Global Crossing's reported revenues [and other financial information] were accurate." (P. Mem. at 45–46.) However, the complaint makes no such allegations, and the actual opinion letters incorporated by reference in the complaint, as discussed above, make no such representations: DLJ explicitly *denied* making an "independent evaluation" of GC's value. Thus, the theory set forth in plaintiffs' brief—essentially, that DLJ misled investors by purporting to undertake an investigation of GC's value when in reality it was opining on the fairness of the merger "without so much as questioning the market value of Global Crossing's stock" (P. Mem. at 46), is not only not alleged in the complaint, but is flatly inconsistent with the docu-

ments referenced there, which make clear that DLJ affirmatively disclosed that it did not "so much as question[ ]" the accuracy of the financial information provided by GC.[10]

Accordingly, Count XIV must be dismissed as to DLJ, since the complaint nowhere alleges that DLJ's statement of opinion was false.

## V. *Other Arguments*

Defendants' other arguments are more quickly disposed of. The April 2000 underwriters argue that plaintiffs fail to state a claim under section 11 because they have not identified a specific false statement in the April 2000 registration statements. They also argue that they were entitled to rely on the expertise underlying the audited financial statements prepared by GC's accountants, Arthur Andersen LLP.

■ The complaint alleges, among other things, that the registration statement and prospectus incorporated by reference GC's 1999 form 10–K, which plaintiffs claim was misleading in that it was based on inaccurate interpretations of FASB 13 as applied to the recognition of revenue from IRU's. (Compl. ¶ 370; *see id.* ¶¶ 120–121.) The complaint also alleges that the April 2000 registration statement "repeated Global Crossing's misleading disclosure regarding its change in accounting procedures after FIN 43 became effective." (*Id.* ¶ 371.) The complaint adequately sets forth the theory on which plaintiffs contend that GC's position on the

effect of FIN 43 was intentionally misleading. (*Id.* ¶¶ 154–157.) These, of course, are contested claims, and they may or may not be established on a full factual record. But it cannot be maintained that plaintiffs have not adequately alleged that the registration statements contained false and misleading information.

■ As for the claim of justified reliance on the audited financial statements, it is true that section 11 provides a defense where an underwriter has "no reasonable ground to believe and did not believe" that the statements were false or misleading. 15 U.S.C. § 77k(b)(3)(C). But the statute expressly provides that the burden of proof is on defendants to establish this defense, *id.,* and the plaintiffs need not negate such an affirmative defense in their pleading. *In re Enron,* 258 F.Supp.2d at 596; *Funke v. Life Financial Corp.,* 237 F.Supp.2d 458, 474–75 (S.D.N.Y.2002); *In re Turkcell Iletisim Hizmetler A.S. Securities Litig.,* 202 F.Supp.2d 8, 12 (S.D.N.Y. 2001); *Griffin v. PaineWebber Inc.,* 84 F.Supp.2d 508, 513 (S.D.N.Y.2000); *In re Chambers Dev. Securities Litig.,* 848 F.Supp. 602, 624 (W.D.Pa.1994).

The April 2000 underwriters also claim that plaintiffs' enormous mountain of a pleading fails to satisfy the requirement of Rule 8(a), Fed.R.Civ.P., that a complaint provide "a short and plain statement of the claim showing that the pleader is entitled

---

**10.** Plaintiffs' complaint could be read, with considerable generosity, as alleging that DLJ misrepresented its true opinion, insofar as it could be read as alleging that none of the defendants named in Count XIV had reason to believe the "statements" that they made (Compl.¶ 811); hence, since the only statement DLJ made was that in its opinion the transaction was fair based on the information provided to it, the complaint must be alleging that DLJ had no reason to believe, and hence

did not believe, that this was its true opinion. This would be a remarkably strained reading of a sentence that more naturally is read to assert that none of the parties had reason to believe in the accuracy of the underlying statements about GC's financial condition. Moreover, as discussed in the text, plaintiffs make no attempt to assert or defend such a theory in their brief, and instead present an altogether different, and untenable, theory of DLJ's liability.

to relief." The complaint, which contains 840 paragraphs spread over 326 pages, certainly could not be characterized as pithy. Nor is this failing entirely dismissible as a mere question of style. It has not been easy for the Court, any more than it was likely easy for defendants, to identify clear-cut statements, for example, that juxtapose what the complaint alleges were misleading statements with what it asserts were the true facts.

■ Nevertheless, the complaint should not be dismissed on this basis. Plaintiffs appropriately have chosen to join a large number of claims against a large number of defendants, based on a number of different theories and securities offerings, since those claims all arise out of the same underlying alleged accounting fraud, which itself is quite complex. It is perfectly understandable, particularly in light of Rule 9(b)'s requirement that fraud be alleged with particularity, that plaintiffs have erred on the side of detail and prolixity in an effort to explain the facts from which their claims emerge. A motion to dismiss is a vehicle for testing the legal sufficiency of plaintiffs' claims, and not a device for editing their prose.

Finally, the underwriters argue that plaintiffs have named a variety of defendants who are mere corporate affiliates of the actual underwriters, and who played no part in the actual stock issue. It appears quite likely that this is the case. Defendants provide a chart which appears accurately to list the corporate entities identified in the prospectuses of the April 2000 offerings, and which also lists a number of other defendants, affiliated in one way or another with those underwriters, who are named as defendants in the complaint. (Mem. at 8.) The complaint at most vaguely defines these additional defendants as members of groups that are "collectively" identified by a general title, and then alleges in its substantive portions that the group or collective participated in the underwriting, without identifying the particular role alleged to have been played by any of the specific affiliated entities.

Plaintiffs argue that they have alleged that all of these entities participated in the underwriting, and that the extent of their participation is simply a question of fact to be resolved at a later stage of the action. See In re Enron Corp., 235 F.Supp.2d 549, 564 n. 5 (S.D.Tex.2002) (postponing consideration of accuracy of plaintiffs' identification of affiliated defendants). The attractiveness of this approach is somewhat undermined by instances in which plaintiffs' identification of particular defendants is less than plausible, or where it is not even clear that an entity has been named as a defendant at all.[11]

■ Nevertheless, there is no particular reason to resolve these issues at this stage. Plaintiffs have, on whatever factual basis, alleged that the named defendants played a role in the underwriting. If those allegations cannot be borne out by the

---

11. For example, plaintiffs define J.P. Morgan Securities, Inc., a subsidiary of defendant J.P. Morgan Chase & Co., as a defendant (Compl.¶ 79), when the actual underwriter of the April 2000 common stock offering was another subsidiary, Chase Securities Inc., which did not merge with Chase until December 2000 and apparently had nothing to do with the underwriting. (Mem. at 8 n. 7.)

Defendant Salomon Smith Barney Holding, Inc., is defined in the complaint as the parent of underwriter defendant Salomon Smith Barney Inc. (Compl.¶ 70), but the relevant counts in the complaint are charged against "SSB," which is the complaint's defined shorthand term only for the subsidiary and not for the parent (id.).

evidence, they will assuredly be dismissed at a later stage; if plaintiffs do not have a good faith basis for their allegations, any defendant that is not promptly dismissed after putting plaintiffs on notice of their error may well be in a position to move for sanctions. Since all of the arguably misnamed defendants are affiliates of properly-named underwriters, and since none of them have retained separate counsel or otherwise undergone unnecessary expense, the effort to sort out the proper defendants at this stage (which would in any event permit later amendment of the complaint based on evidence uncovered in discovery) seems inefficient. The motion to dismiss these defendants is therefore denied, without prejudice to later renewal, and with a strong admonition to plaintiffs promptly to dismiss any defendant as soon as it is clear that a claim against it cannot be sustained.

## CONCLUSION

For the reasons stated above, Counts II and VII are dismissed as time-barred, Count XII is dismissed for lack of standing, with leave to replead, and Count XIV is dismissed as to defendant DLJ. The motion of the April 2000 underwriters to dismiss Count XIII is denied.

SO ORDERED.