Filed 1/23/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| GARTH JENSEN et al.,<br><br>     Plaintiffs and Appellants,<br>v.<br><br>iSHARES TRUST et al.,<br><br>     Defendants and Respondents. | A153511<br><br>(San Francisco County<br>Super. Ct. No. CGC 16-552567) |

Investors who purchased shares of exchange-traded funds sued the issuers of the fund and associated entities for violations of disclosure requirements under the federal Securities Act of 1933. The trial court entered judgment for respondents after finding appellants lacked standing to pursue their claims. Appellants' challenge to this ruling is based on a provision of the Investment Company Act of 1940 they view as conferring standing and various differences between exchange-traded funds and traditional investment vehicles. We affirm.

**BACKGROUND**

Appellants are individual investors who purchased one or more shares of BlackRock iShares Exchange-Traded Funds (ETFs) and thereafter suffered financial losses when their shares were sold pursuant to "market orders" or "stop-loss orders" during a "flash crash" on August 24, 2015, when ETF trading prices fell dramatically. Appellants maintain that BlackRock's registration statements, prospectuses and amendments thereto (collectively, "offering documents") issued or filed between 2012 and 2015, were false or misleading in that they failed to sufficiently disclose the risks associated with flash crashes. Appellants purchased their ETF shares after these allegedly defective offering documents were issued or filed.

1

Respondent iShares Trust (iShares) is registered with the United States Securities and Exchange Commission (SEC) as an open-end management investment company under the Investment Company Act of 1940 (ICA) (15 U.S.C. § 80a et seq.), and encompasses numerous separate ETFs. BlackRock Fund Advisors (BFA) is the investment advisor for the Blackrock iShares Funds at issue in this case. BFA is a subsidiary of BlackRock, Inc. (BlackRock), which controls iShares, BFA and BlackRock Investments, LLC, the distributor for iShares. The remaining respondents on this appeal are four of the 11 individual defendants named in the complaint.

According to the allegations of the complaint and evidence before the trial court, ETFs, which first came to market in the 1990s, are investment companies that are registered under the ICA as open-end funds or unit investment trusts. (SEC Concept Release: Actively Managed Exchange-Traded Funds, 17 C.F.R. Part 270 [Release No. IC-25258].) Instead of transacting in individual shares, however, ETFs sell and redeem shares, at net asset value (NAV),[1] only in large aggregations or blocks called "Creation Units." (SEC Concept Release: Actively Managed Exchange-Traded Funds, 17 C.F.R. Part 270 [Release No. IC-25258].) Creation units are sold to "authorized participants," such as broker-dealers or large institutional investors, which may then sell some or all of the shares to investors in the secondary market; creation units are not sold directly to retail investors.[2] (*Ibid.*) ETFs are listed for trading on national securities exchanges, allowing investors to purchase and sell ETF shares at market prices, not necessarily at NAV. ETFs have some characteristics of traditional open-end funds, which issue redeemable shares, and some characteristics of closed-end funds, which generally issue shares that trade on exchanges at negotiated prices and are not redeemable. (SEC

---

[1] Net asset value, or NAV, is the ETF's assets minus liabilities divided by the number of outstanding shares.

[2] "Secondary market" refers to transactions between investors, such as through public exchanges, as distinguished from "primary market" transactions in which investors purchase directly from the issuer of the securities.

Concept Release:  Actively Managed Exchange-Traded Funds, 17 C.F.R. Part 270 [Release No. IC-25258].)  Early ETFs passively track the performance of specific United States equity indices; newer ones often are actively managed and seek to track indices of fixed-income instruments and foreign securities.[3]

Appellants alleged that BlackRock portrayed ETFs as safe investments, designed to reduce and protect investors from market volatility, despite being aware of particular risks that it failed to disclose to investors.  At issue in the present case is the use of stop-loss orders with ETFs.  A stop-loss order requires that an investor's security be bought or sold when the stock value hits a certain price; when the stock price drops to the preset price, the order is automatically converted to a market order and the security trade is automatically executed at market price.  Stop-loss orders are generally used to limit risk, but in times of high volatility can have the opposite effect.  Appellants alleged that the use of stop-loss and market orders to hedge ETF risk "amplifies the disengagement of ETF values from their NAV" due to "lack of liquidity in the ETF market":  "When ETF markets are highly illiquid, market sell orders sweep through available purchase orders, allowing ETF prices to plummet and reflect a sales price completely unrelated to an ETF's underlying value."

On May 6, 2010, equity markets in the United States experienced a "flash crash" in which equities and ETFs holding equities declined "precipitously" for approximately a half hour during afternoon trading.  Many ETFs traded 60 percent lower than the value of

---

[3] The role of the authorized participants is illustrated in the following description: "The most distinctive feature of the ETF is its arbitrage mechanism.  The purpose of this mechanism is to help bring together the price at which an ETF's shares trade on a stock exchange and the pro rata value of the fund's underlying assets, which is known as its net asset value . . . .  This parity between trading price and NAV is essential to an ETF's unique role as a nearly frictionless, nearly universal, financial portal.  The arbitrage mechanism poses risks, because it relies entirely on market incentives to lead certain 'authorized participants' ('APs') to enter into just the right transactions at just the right times with an ETF and traders in the secondary market so that the trading price of a share will be close to the share's NAV."  (Hu, H. and Morley, J, A Regulatory Framework for Exchange-Traded Funds 91 So.Cal. L.Rev. 839, 845 (2018).)

their underlying assets. BlackRock later observed that this was similar to a 2008 crash, when ETFs traded 5-8 percent lower than the underlying value of their assets. BlackRock reported to regulators that in the 2008 and 2010 crashes, stop-loss orders increased the volume of sell orders for ETFs, resulting in decreased liquidity and exacerbation of disproportionate declines in ETF prices as compared to the ETF's underlying assets. In 2011, BlackRock wrote to the SEC that it expected "mini-flash" crashes to recur and ETF investors needed education on the use of market and stop-loss orders. In 2013, BlackRock acknowledged that the 2010 flash crash disproportionately affected "US ETFs holding US equities."

Appellants alleged that the offering documents pursuant to which they purchased respondents' ETFs disclosed that ETFs are subject to volatility but did not disclose "the known inherent risk" of using stop-loss orders with ETFs, despite respondents' admitted knowledge of the likelihood of disproportionate harm and belief that more flash crashes were inevitable. iShares "continuously issues and redeems ETF shares," issuing and selling new shares of each series in primary market transactions pursuant to registration statements or amended registration statements filed with the SEC. Accordingly, iShares registration statements are amended at least annually.

On August 24, 2015, another flash crash occurred. BlackRock ETF investors who had placed market or stop-loss orders prior to or at the opening of the market suffered disproportionate losses as their shares were sold below their designated stop prices and below the net asset value of the shares. Price declines of more than 20 percent occurred in 19.2 percent of all ETFs, compared with declines of 4.7 percent in corporate securities. For example, one of BlackRock's iShares ETFs dropped more than 35 percent while the underlying investments in the fund dropped only 2 to 4 percent; another ETF dropped over 60 percent.

BlackRock has since admitted that during the crash, " 'retail investors who had standing stop-loss orders were especially impacted.' " As a result of the August 24, 2015, flash crash, the New York Stock Exchange and other exchanges announced that stop-loss orders and " 'good-til-canceled' " orders would no longer be accepted.

Appellants' original class action complaint was filed on June 16, 2016, and alleged claims under sections 11, 12(a)(2) and 15 of the 1933 Act. (15 U.S.C. §§ 77k (section 11) 77l (section 12), 77o (section 15).)[4] Respondents moved for judgment on the pleadings, which was granted (on a statute of limitations issue) with leave to amend. The trial court noted, however, that appellants' allegations concerning misstatements in and omissions from the offering documents were sufficient to state a claim. Appellants filed their first amended complaint on January 6, 2017. Respondents again moved for judgment on the pleadings, this time asserting for the first time that appellants lacked standing.[5] Their argument was that liability under sections 11 and 12(a)(2) of the 1933 Act applies only to initial offerings, and appellants purchased their ETF shares on the secondary market. The court granted the motion as to the section 12 claim on this basis but denied it as to the claims under sections 11 and 15.[6] As to section 11, the court cited case law holding that a plaintiff has standing if shares purchased in the secondary market can be traced back to an offering made under a misleading registration statement, and found the record insufficient to determine the issue at that time.

The parties agreed to a bifurcated bench trial on the issue of "standing/tracing." The trial consisted of the parties' arguments based on evidence submitted by means of declarations and attached exhibits, the parties having waived objection to the admissibility of the declarations and exhibits thereto and exhibits to the trial briefs and limited their objections to weight or relevancy of the evidence. Appellants argued they were not subject to the tracing requirement under section 11 because iShares is governed by the ICA and, under section 24(e) of the ICA (15 U.S.C. § 80a-24(e)) (section 24), the

---

[4] Further statutory references will be to title 15 of the United States Code.

[5] The answer to the first amended complaint filed by seven of the individual defendants raised as an affirmative defense that appellants lacked standing to bring the claims. Respondents' answer did not raise standing, nor had any of the earlier answers or pleadings in the case.

[6] The court found the first amended complaint sufficient with respect to the statute of limitations.

latest amendment to a registration statement governs all securities sold after it goes into effect, no matter how or to whom they were sold. Thus, according to appellants, they had standing if they purchased their shares after respondents issued defective registration statements or prospectuses, regardless of what offering documents were in effect when the shares were first sold. Interpreting the language of section 24(e) in light of its conclusions that the 1933 Act "focuses on the initial public offering" (hence the tracing requirement) and appellants failed to demonstrate that this focus was "shifted" by the ICA, the trial court found appellants lacked standing to bring their claims under section 11 or section 15, which was dependent upon section 11.[7]  The court entered judgment for respondents, and this appeal followed.

## DISCUSSION

Appellants' claims relate to the 1933 Act and the ICA. Among the federal statutes regulating the securities industry, "[t]he 1933 Act regulates initial distributions of securities, and the 1934 [Securities Exchange] Act [1934 Act] for the most part regulates post-distribution trading." (*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.* (1994) 511 U.S. 164, 171; *Blue Chip Stamps v. Manor Drug Stores* (1975) 421 U.S. 723, 752 [1934 Act "chiefly concerned with the regulation of post-distribution trading on the Nation's stock exchanges and securities trading markets"; 1933 Act "far narrower statute chiefly concerned with disclosure and fraud in connection with offerings of securities—primarily . . . initial distributions of newly issued stock"]; *Cyan, Inc. v. Beaver County Employees Retirement Fund* (2018) ___ U.S. ___, 138 S.Ct. 1061, 1066 [1934 Act "regulated not the original issuance of securities but instead all their subsequent trading, most commonly on national stock exchanges"].)  "The [ICA]

---

[7] Section 15(a), provides that "[e]very person who . . . controls any person liable under section 77k or 77l, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." (§ 77o(a).)

6

originated in congressional concern that the [1933 Act] and the [1934 Act] were inadequate to protect the purchasers of investment company securities" (*United States v. National Assn. of Securities Dealers, Inc.* (1975) 422 U.S. 694, 704) and "concern with 'the potential for abuse inherent in the structure of investment companies.' " (*Daily Income Fund, Inc. v. Fox* (1984) 464 U.S. 523, 536, quoting *Burks v. Lasker* (1979) 441 U.S. 471, 480 [99 S.Ct. 1831])[8] The ICA's Findings and Declaration of Policy reflect concern with matters including disclosure to investors regarding both securities and management, and operation, management and control of the companies. (§ 80a-1.)[9]

## I.

"Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k, provides a cause of action to any person who buys a security issued under a materially false or misleading registration statement." (*In re Century Aluminum Co. Securities Litigation* (9th Cir. 2013) 729 F.3d 1104, 1106 (*Century Aluminum*).) Specifically, "[i]n case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may . . . sue . . ." specified individuals and entities directly involved with the preparation and certification of a registration statement. (15 U.S.C. § 77k(a).)

Appellants' argument focuses on the language of two statutory provisions they view as defining standing to bring their claims. Section 6(a) of the 1933 Act (§ 77f)

---

[8] A primary concern was the conflict of interest resulting from the fact that "[u]nlike most corporations, an investment company is typically created and managed by a pre-existing external organization known as an investment adviser. [Citation.] Because the adviser generally supervises the daily operation of the fund and often selects affiliated persons to serve on the company's board of directors, the ' "relationship between investment advisers and mutual funds is fraught with potential conflicts of interest." ' [Citation.]" (*Daily Income Fund, Inc. v. Fox, supra,* 464 U.S. at pp. 536–537.)

[9] The 1934 Act is not directly at issue in this case but relevant primarily for purposes of comparison.

(section 6), in describing the "method of registration" of securities with the SEC, provides, "A registration statement shall be deemed effective *only as to the securities specified therein as proposed to be offered*."[10] (§ 77f(a), italics added.) Appellants contrast the italicized language with section 24(e), which provides, "For the purposes of section 11 of the Securities Act of 1933, as amended, the effective date of the latest amendment filed shall be deemed the effective date of the registration statement *with respect to securities sold after such amendment shall have become effective*." (§ 80a-24(e).) Appellants view the broader language of section 24(e)—making an amendment "effective" for purposes of the 1933 Act as to all securities sold after its effective date rather than only as to "the securities offered" in the amendment—as reflecting congressional intent to allow broader standing for 1933 Act claims involving investment companies.

" 'The plaintiff in a § 11 claim must demonstrate (1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment.' (*In re Stac Elecs. Sec. Litig.* [(9th Cir.1996)] 89 F.3d 1399, 1403–1404 ("*In re Stac*") (citation and internal quotation marks omitted). 'No scienter is required for liability under § 11; defendants will be liable for innocent or negligent material misstatements or omissions.' *Id.* (citing *Herman & MacLean v. Huddleston* [(1983)] 459 U.S. 375, 382 . . .)." (*In re Daou Systems, Inc.* (9th Cir. 2005) 411 F.3d 1006, 1027.)

---

[10] Pursuant to SEC regulations, in certain circumstances securities may be registered for an offering "to be made on a continuous or delayed basis in the future" (17 C.F.R. § 230.415), in which case the registrant must file "post-effective" amendments to the registration statement and, "for the purpose of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new registration statement *relating to the securities offered therein . . . .*" (17 C.F.R. § 229.512(a)(2), italics added.)

This absence of a scienter requirement for claims under section 11 of the 1933 Act is in contrast to claims under section 10(b) of the 1934 Act, which "prohibits 'any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.' " (*Rubke v. Capitol Bancorp Ltd.* (9th Cir. 2009) 551 F.3d 1156, 1164, citing 17 C.F.R. § 240.10b–5(c)).[11] For a section 10(b) claim, "a plaintiff must prove '(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss.' " (*Rubke,* at p. 1164, citing *In re Daou Systems, Inc., supra*, 411 F.3d at p. 1014.)

The distinction is significant because it relates to the tracing requirement that is at the heart of the present case. For a claim under section 11 of the 1933 Act, "[p]laintiffs need not have purchased shares in the offering made under the misleading registration statement; those who purchased shares in the aftermarket have standing to sue provided they can trace their shares back to the relevant offering. *Hertzberg v. Dignity Partners,*

---

[11] Section 10b provides: "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [¶] . . . [¶] (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement[,] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." (§ 78j.)

SEC rule 10b-5 provides: "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, [¶] in connection with the purchase or sale of any security." (17 C.F.R. § 240.10b-5; SEC rule 10b-5.)

*Inc.* [(9th Cir. 1999)] 191 F.3d 1076, 1080; *Lee v. Ernst & Young, LLP* [(8th Cir. 2002)] 294 F.3d 969, 978. When all of a company's shares have been issued in a single offering under the same registration statement, this 'tracing' requirement generally poses no obstacle. *Hertzberg, . . .* F.3d at 1082. But when a company has issued shares under more than one registration statement, the plaintiff must prove that her shares were issued under the allegedly false or misleading registration statement, rather than some other registration statement. *Id.* at 1080 n. 4." (*Century Aluminum, supra,* 729 F.3d at p. 1106.)

Thus, "[w]hile Section 11's liability provisions are expansive—creating 'virtually absolute' liability for corporate issuers for even innocent material misstatements—its standing provisions limit putative plaintiffs to the 'narrow class of persons' consisting of 'those who purchase securities that are the direct subject of the prospectus and registration statement.' " (*Krim v. pcOrder.com, Inc.* (5th Cir. 2005) 402 F.3d 489, 495.) Tracing of the chain of title for shares back to a specific offering "is 'often impossible,' because 'most trading is done through brokers who neither know nor care whether they are getting newly registered or old shares,' and 'many brokerage houses do not identify specific shares with particular accounts but instead treat the account as having an undivided interest in the house's position.' " (*Century Aluminum, supra,* 729 F.3d at p. 1107, quoting *Barnes v. Osofsky* (2d Cir.1967) 373 F.2d 269, 271–272.) Nevertheless, "[t]hough difficult to meet in some circumstances, this tracing requirement is the condition Congress has imposed for granting access to the 'relaxed liability requirements' section 11 affords." (*Century Aluminum,* at p. 1107, quoting *Abbey v. Computer Memories, Inc.* (N.D.Cal.1986) 634 F.Supp. 870, 875 (*Abbey*).)

Appellants seek to avoid the tracing requirement by relying upon section 24(e). Although appellants assert claims only under the 1933 Act, not directly under the ICA, they argue that because the investments at issue were sold by an investment company, their standing is governed by the ICA. They see section 24(e) as the relevant standing provision. But the fact that appellants' claims derive from the 1933 Act is critical. In order to assert such claims, they must have standing *under the 1933 Act*. The only

question is whether section 24(e) created different rules for such standing under the 1933 Act where the claims are against investment companies governed by the ICA.[12]

As the issue on appeal is solely one of statutory interpretation, our review is de novo. (*Bruns v. E-Commerce Exchange, Inc.* (2011) 51 Cal.4th 717, 724.) Appellants correctly note that our starting point must be the language of the statutory provisions at issue. (*Connecticut Nat. Bank v. Germain* (1992) 503 U.S. 249, 253–254; *People v. Statum* (2002) 28 Cal.4th 682, 689–690.) Appellants argue that the "plain" and "straightforward" language of section 24(e)—"[f]or the purposes of section 11 of the Securities Act of 1933, as amended, the effective date of the latest amendment filed shall be deemed the effective date of the registration statement with respect to securities sold after such amendment shall have become effective"—gives them standing to sue under section 11 because they purchased ETFs "after the latest applicable amendment to the pertinent registration statement for the fund."

Appellants thus view the language of section 24(e) as unambiguously demonstrating that Congress intended to allow claims under section 11 to be brought by any investor who purchased investment company securities "sold after" an amendment alleged to violate the 1933 Act, including investors who purchased their shares on the

---

[12] Appellants' brief is replete with references to their rights under the ICA, presenting their claims as if their causes of action derived directly from that legislation rather than from the 1933 Act. A small sampling of such references includes the following: "It would be inconsistent to give Section 11 in the [1933] Act a robust application but investor rights under the ICA a toothless one." "ICA standing turns simply on the sale of a security governed by the statute." "When an investment company is the seller, substantive rights and liability are governed by the [1933] Act but, critically, the ICA contains its own standing provision." "The trial court's leap of logic to require section 11-type tracing for ICA standing . . ." "[u]rging this court to expand [1933] Act tracing, defendants seek to equate [1933] Act standing with ICA standing." "The [1933] Act standing language involving the tracing of specific shares to establish standing, 15 U.S.C. § 77k, was thus deliberately *not* repeated in the ICA." "The [1933] Act terminology 'securities specified therein' and 'such securities' cannot be penciled into the ICA. Likewise, its standing terminology 'sold after' cannot be written out of the ICA." "This case involves standing under the ICA."

11

secondary market rather than directly from the issuer and regardless of the investors' ability to demonstrate that their shares were initially distributed by the issuer in connection with the allegedly defective amendment. The trial court, they maintain, improperly equated standing under the ICA with standing under the 1933 Act despite the statutes being "written very differently," and rendered the broader ICA standing language "surplusage."

Appellants correctly assert that when a statute's words are unambiguous, no further inquiry is necessary or appropriate. (*Connecticut Nat'l Bank v. Germain, supra,* 503 U.S. at p. 254; *People v. Statum, supra,* 28 Cal.4th at p. 690.) "Statutory language, however, 'cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.' " (*Roberts v. Sea-Land Services, Inc.* (2012) 566 U.S. 93, 101; *Davis v. Michigan Dept. of Treasury* (1989) 489 U.S. 803, 809.) In our view, the meaning of "sold after" in section 24(e) is not without ambiguity.

First, the "plain language" of the statute does not necessarily reflect appellants' view of it. "For the purposes of section 11 of the Securities Act of 1933" obviously refers to the cause of action created by section 11, which turns on whether "any part of the registration statement" was false or misleading "when such part became effective." That the "effective date of the latest amendment filed shall be deemed the effective date of the registration statement" can only mean that the latest amendment may be the basis of a section 11 suit. But the critical language of the provision is less clear. The phrase "with respect to securities sold after such amendment shall have become effective" does not clarify what sale was contemplated by use of the term "sold"—the initial sale of ETF shares by the issuer, as respondents maintain and the trial court found, or also subsequent sales on the secondary market.

Appellants assert that "sold" necessarily refers to any sale of the shares, including sales on the secondary market, juxtaposing the language of section 24(e) with that of section 6(a), the provision of the 1933 Act imposing the limitation that a registration statement is "effective" only "as to the securities proposed to be offered under that

registration statement." Section 6(a), as explained above, is the source of the tracing requirement for standing to assert a claim under section 11.

But there is no obvious reason to conclude that the references to "effective date" in section 6 of the 1933 Act and in section 24(e) of the ICA were intended to serve the same purposes, so as to make that comparison meaningful with respect to standing under the 1933 Act. Section 11 uses the effective date of the registration statement to define the temporal point at which the validity of a registration statement is to be measured— liability is imposed where "any part of the registration statement" contained a false or misleading statement or omission "when such part became effective." Section 6(a), in stating that a registration statement is "effective only as to the securities specified therein" uses "effective" in a different sense, to clarify the securities to which a registration statement applies and thereby impose a limitation that speaks to the focus of the 1933 Act on primary market transactions— public offerings by the issuer, not sales on the secondary market. Section 24(e) of the ICA uses "effective date" in the same sense as section 11, to define the point at which the validity of challenged statements or omissions are to be measured for purposes of liability in the context of investment companies utilizing amendments rather than registration statements for their continuous offerings. (See Jacobs, 5 Disclosure & Remedies under the Securities Laws, § 3:72, p. 398 ["securities sold after such amendment shall have become effective . . . [¶] means (1) securities sold pursuant to the registration statement after the effective date of the posteffective amendment, not (2) securities sold in the open market after such effective date"].)

Comparing the language of section 6(a) with that of section 24(e) does not clarify what sale was contemplated by use of the term "sold" in section 24(e)—the initial sale of ETF shares by the issuer, as respondents maintain, or also subsequent sales on the secondary market. The fact that section 24(e) refers to section 11 is a strong indication that Congress was contemplating sales in the primary market. Appellants point to nothing in the legislative history to suggest that Congress intended section 24(e) of the ICA to alter the focus of the 1933 Act on primary market transactions directly involving

13

the issuer of securities, and we are aware of no basis for assuming that section 24(e) was meant to override section 6(a) in claims under the 1933 Act against investment companies.

Section 24 of the ICA, as its title indicates, is concerned with "Registration of securities under the Securities Act of 1933"; it describes rules applicable to securities issued by registered investment companies that vary from the rules otherwise governing registration of securities under the 1933 Act.  In particular, section 80a-24(e) "permits the registration of additional securities of open-end investment companies to be effected by amending an earlier registration statement, instead of filing a new one." (*P. Stolz Family Partnership L.P. v. Daum* (2d Cir. 2004) 355 F.3d 92, 105; *Morse v. Peat, Marwick, Mitchell & Co.* (S.D.N.Y. 1977) 445 F.Supp. 619, 623.)  As explained in congressional committee reports concerning the proposed amendment by which it was adopted in 1954, subdivision (e), to section 24 would "afford to those investment companies engaged in continuous offerings (i.e., unit investment trusts, face-amount certificate companies, and open-end management companies) the alternatives of registering additional securities under the Securities Act of 1933 either by filing a new registration statement or, by virtue of this new section 24(e), by filing an appropriate amendment, at intervals of approximately 1 year, to the latest effective registration statement under the Securities Act of 1933 for securities of the same class." (Sen.Rep. No. 83-1036, 2d Sess. p. 21 (1954); H.R.Rep. No. 83-1542, 2d Sess., p. 30 (1954).)  It appears that Congress sought to alleviate administrative burdens on the companies while still ensuring provision of current information about the securities in these continuous offerings. (*Ibid.*)  For example, the congressional reports explain that the "new section 24(e), by appropriate reference to section 10 of the Securities Act ["information required in prospectus"], will require that current information be made a part of the registration statement at approximately yearly intervals.  It is not the intent of this paragraph, however, that every change made in a prospectus will involve the filing of such changed prospectus as part of the registration statement.  It is intended that only those revised prospectuses which reflect a periodic general revision, to bring up to date the latest prospectus contained in

14

the registration statement, or other important change must be filed as part of the registration statement." (Sen.Rep. No. 83-1036, 2d Sess. p. 21 (1954); H.R.Rep. No. 83-1542, 2d Sess., p. 30 (1954).)

Given this context, the simplest interpretation of the sentence in section 24(e) referring to section 11 of the 1933 Act is as clarification that a section 11 claim may be based upon false or misleading statements in the most recent amendment despite section 11 itself referring only to registration statements. Read this way, section 24(e) does not confer standing to sue under section 11 but simply confirms that the changes in requirements for registration of securities under the ICA do not affect 1933 Act liability.

The same congressional reports demonstrate that section 24(e) was meant to maintain companies' liability under the 1933 Act despite its authorization of amendments in place of registration statements for companies engaged in continuous offerings: "Paragraph (3) also contains references to section 11 and 13 of the Securities Act so that there will be no departure from either the disclosure standards or the liabilities imposed upon sellers. Thus, under the new section 24(e) of the Investment Company Act, the registration statement under the Securities Act of 1933 of an issuer referred to in this subsection must meet the standards of section 11 of the Securities Act not only on the original effective date but also on the effective date of each posteffective amendment to such registration statement, and the periods of limitation on actions provided in section 13 of the Securities Act start anew with respect to securities sold thereafter each time such registration statement is effectively amended either to increase the number or amount of securities registered or to make the above-mentioned revisions of the prospectus a part of the registration statement." (H.R.Rep. No. 83-1542, 2d. Sess. p. 31 (1954).) "The intention of the legislation was thus to conform the registration procedures of the Securities Act to the special needs of investment companies but, simultaneously, to preserve intact the § 11 liability of investment companies." (*Morse v. Peat, Marwick, Mitchell & Co., supra,* 445 F.Supp. at p. 623.) There is no indication that the legislation was intended to expand section 11 liability.

15

Another point makes it clear that in referring to shares "sold" after the effective date of an amendment, section 24(e) contemplated sales by the issuer. As we have said, when section 24(e) was enacted in 1954, Congress was concerned with open-end mutual funds offering shares on a continuous basis. Open-end companies were described in the congressional reports as "those in which the security holders can at their option compel the company to redeem or repurchase their securities at the actual asset value of such securities." (H.R.Rep. No. 2639, 76th Cong., 3d Sess., p. 6 (1940).) As appellants acknowledge, redeemable securities were not sold in the secondary market prior to "recent SEC exemptions." Indeed, the ICA "was designed to restrict most of secondary market trading" in mutual fund shares. (*United States. v. National Assn. of Securities Dealers, Inc., supra,* 422 U.S. at p. 700.) The United States Supreme Court observed in 1973 that "[p]rivate trading in mutual fund shares is virtually nonexistent." *(United States v. Cartwright* (1973) 411 U.S. 546, 547.) There is no reason to believe that Congress, when it enacted section 24(e) in 1954, intended to enable investors who purchased shares in an open end mutual fund to assert a cause of action under section 11 of the 1933 Act.

In sum, the remarks in the congressional reports concerning the references to section 11 and 13 of the 1933 Act in section 24(e) of the ICA explain the need for and purpose of the language appellants rely upon without resort to an interpretation that alters the long-standing requirement that a plaintiff seeking to assert a claim under the 1933 Act must demonstrate that his or her shares were initially offered to the public by the issuer under the allegedly offending registration statement or amendment.

In appellants' view, the continuous offerings that distinguish ETFs and other investment company offerings from the traditional securities offerings of other corporations require a different view of which investors may bring an action to enforce the disclosure requirements of the 1933 Act, expanding the cause of action from only those investors whose shares derive from the challenged registration statement to any investors who purchase any shares after the challenged amendment, even if those shares were or could have been initially offered to the public under an accurate registration

16

statement. Due to their use of continuing offerings, investment companies must comply with requirements such as filing annual reports (17 C.F.R. 270.30a-1) and amendments to their registration statements (15 C.F.R. 270.8b-16(a)), and updating prospectuses approximately annually (15 U.S.C. §§ 24(e), 77j(a)(3)). Appellants point to statements by the SEC and Barclays Global Fund Advisors (BGFA), BlackRock's predecessor, confirming that such requirements are meant to serve the needs of investors in the secondary market. For example, commenting in 2008 upon proposed rule changes regarding open-end fund prospectuses, BGFA "agree[d] with the Commission's view that it is appropriate to treat investors purchasing ETF shares in the secondary market as the intended recipients of ETF prospectus disclosure."[13] In announcing rule amendments "intended to result in the disclosure of more useful information to investors who purchase shares of exchange-traded funds on national securities exchanges," the SEC stated that the amendments were "designed to meet the needs of investors (including retail investors) who purchase ETF shares in secondary market transactions rather than financial institutions that purchase creation units directly from the EFT." (SEC Release Nos. 33-8998; IC-28584; File No. S7-28-07, pp. 1, 51.)

Appellants take this recognition that amendments to ETF registration statements aim to provide information to secondary market investors as reason to interpret section 24(e) as giving standing to such investors under section 11 of the 1933 Act. This does not follow. As trading of shares on the secondary market is a core feature of ETFs, it is not surprising that the issuer and SEC would recognize the need for accurate disclosure to secondary market investors. But this does not necessarily mean defective disclosure in registration statement amendments must give rise to a cause of action under the 1933 Act where the plaintiffs' shares were not necessarily offered for sale by the issuer pursuant to

---

[13] This comment was made in the course of addressing what information needed to be included in a prospectus; BGFA opined that secondary market investors do not need information on how creation units are purchased and redeemed and other "primary market issues," and inclusion of such information in the prospectus "creates confusing disclosure that is not helpful to investors." The SEC agreed with this point.

17

the offending document.  The 1933 Act, as we have said, focuses on primary market transactions—sales of shares by the issuer and the disclosures accompanying such sales.  Defective disclosure in the context of secondary market transactions is the focus of the 1934 Act.

Appellants further argue that it is impossible to trace any individual ETF share to its original issuance.  Unlike traditional stock offerings, which entail registration of a specified number of shares (§ 77aa(11) [registration statement to include "amount of capital stock of each class issued or included in the shares of stock to be offered"]), the registration statement of an open-end management company under the ICA is deemed to register "an indefinite amount of securities."  (§ 80a-24(f)(1).)[14]  Moreover, both primary market creation unit transactions and secondary market transactions in ETF shares are executed without a physical transfer of share certificates.  All ETF creation units and ETF shares are held by the Depository Trust Company (DTC), which holds them in "fungible bulk, meaning that there are no specifically identifiable shares held or owned by any ETF investor."  DTC transfers ETF shares through an "electronic book-entry system," crediting and debiting the accounts of participating members of the DTC (typically broker-dealers, banks, and other institutions), each of which owns a pro rata interest in the aggregate number of shares of a particular ETF held by DTC in fungible bulk.  Each customer of a DTC participant owns a pro rata interest in the shares in which the participant has an interest.  Accordingly, in most cases it is not possible to link specific ETF shares to specific investors.

---

[14] As described in congressional reports concerning the enactment of the ICA, the "peculiarity of open-end companies is that they issue so-called redeemable securities— that is, a security which provides that the holder may tender it to the company at any time and receive a sum of money approximating the current market value of his proportionate interest in the company's assets.  Because of the exercise of this redemption feature, the assets of most open-end companies would constantly be shrinking if they did not continuously sell new securities to investors."  (Sen.Rep. No. 1775, 76th Cong. 3d Sess. p. 3.)

In appellants' view, since issuers of continuously offered securities are required to file amendments to their registration statements in order to ensure availability of current information to investors in the secondary market, those investors should be able to hold the issuers liable for false or misleading information in or omissions from the amendments in the same manner as investors who purchase shares in a traditional offering. Investors on the secondary market may be expected to look to the information in a fund's most recent amendment in considering whether to invest in the fund just as an investor in an initial offering would look to the registration statement, yet with continuously offered and redeemed shares, at least in the "electronic book-entry system" described above, an investor can neither demonstrate ownership of a particular share nor demonstrate that any particular share was offered to the public pursuant to a given amendment, in effect immunizing the issuer from liability under section 11.

But courts enforce the tracing requirement for 1933 Act section 11 standing despite express recognition that tracing may be impossible. As stated by the Fifth Circuit Court of Appeals, "[t]hat present market realities, given the fungibility of stock held in street name, may render Section 11 ineffective as a practical matter in some aftermarket scenarios is an issue properly addressed by Congress. It is not within our purview to rewrite the statute to take account of changed conditions." (*Krim v. pcOrder.com, Inc., supra,* 402 F.3d at p. 498.) The difficulty of tracing shares held in fungible aggregate is neither unique to ETFs nor a new problem. One federal district court explained, "The cause of action inheres in the faulty registration statement that put the shares in question on the market; it is on the basis of the flaw in the underlying registration that section 11 dispenses with the requirements of scienter, and, for those who purchase soon enough after the registration statement, reliance. Those who purchased in the open market shares that were properly registered in an earlier offering are relegated to the securities fraud remedies that include such requirements. Thus, plaintiffs who purchased securities not issued pursuant to the misleading registration statement lack standing as surely as the purchasers of other securities entirely. [¶] As Judge Friendly noted more than 35 years ago, modern market conditions may have made the tracing requirement obsolete. See

19

*Barnes* [*v. Osofsky, supra,*] 373 F.2d at 273. In a world in which the 'shares' purchased by a stockholder might be merely electronic entries in a brokerage firms' books, tracing may be impracticable. . . ." (*In re Global Crossing, Ltd. Securities Litigation* (S.D.N.Y. 2003) 313 F.Supp.2d 189, 208; see, *Colonial Realty Corp. v. Brunswick Corp.* (S.D.N.Y. 1966) 257 F.Supp. 875, 881 [noting problem of fungibility and calls for changes in securities laws]; *The Hemmer Group v. Southwest Water Company* (9th Cir. 2016) 663 F.Appx. 496, 498 [no standing where shares could not be traced because held as "part of a fungible mass" including shares from multiple offerings]; *Abbey, supra,* 634 F.Supp. at p. 872 [no standing where tracing impossible because shares had been part of common pool held in DTC vault on day of transfer].)

Appellants argue that "[t]hrough the ICA, Congress found it necessary to provide broad standing to investors like plaintiffs who purchase after an amended registration statement because the amended registration statement involves the 'continuous offering [of] shares of the same class." They point again to the different language employed in section 24(e) of the ICA and section 6(a) of the 1933 Act, the fact that registration forms under the 1933 Act (SEC Form S-1) require details about the securities offered therein, such as class and amount, that are not called for on registration forms under the ICA (SEC Form N-1A), and the fact SEC rules permitting registration of securities "for the shelf"—securities offered "to the public 'on a continuous or delayed basis' " (*Finkel v Stratton Corp.* (2d Cir. 1992) 962 F.2d 169, 174; 17 C.F.R. § 230.415) use the "securities offered therein" language of section 6(a) with regard to post-effective amendments and annual reports rather than the "sold after" language of section 24(e). This argument is no more than a reiteration of appellants' interpretation of section 24(e). That the SEC continued to use the "securities offered therein" language in rules pertaining to 1933 Act registration confirms the limitation giving rise to the tracing requirement under the 1933

Act. We fail to see how this further elucidates Congress's intent regarding the language of section 24(e).[15]

In effect, appellants' position is that, pursuant to section 24(e), each amendment to a registration statement becomes the operative registration statement for all shares issued pursuant to the original registration statement, including those shares issued prior to the allegedly defective amendment. A similar argument was rejected in *Guenther v. Cooper Life Sciences, Inc.* (N.D. Cal. 1990) 759 F.Supp. 1437 (*Guenther*). Although *Guenther* did not involve an investment company, it is of interest because it involved a shelf registration and therefore, as with an investment company's continuous offering, required the filing of an amended registration statement to update the information provided to investors.[16] The allegedly defective documents in *Guenther* were an amendment to the registration statement for the company's first public offering and the registration statement for a second public offering. The plaintiffs argued that because no new securities were offered in the amendment, the securities offered "therein" (in the language of 17 C.F.R. § 229.512) had to be those offered in the initial public offering. (*Guenther*, at p. 1440.) Rejecting this argument, the *Guenther* court concluded that "plaintiffs who purchased shares in the first offering have no standing to bring a section 11 action, even if they purchased their shares on the open market after the February amendment, since a cause of action under section 11 is available only to purchasers of

---

[15] Appellants assert that when Congress enacted section 24(e), it "rejected calls to similarly amend Section 6(a) of the Securities Act" but offer no citation in support or further explanation of this assertion.

[16] "In a 'shelf registration', the registrant can register a large number of securities and offer the securities to the public 'on a continuous or delayed basis.' [17 C.F.R. § 230.415]; Delayed or Continuous Offering and Sale of Securities, 46 Fed.Reg. 42,001, 42,003 (1981).) In order to insure accurate information for purchasers whenever shelf-registered securities are sold, the SEC requires issuers of shelf-offerings to amend the prospectus 'to reflect . . . any facts or events arising after the effective date of the registration statement . . . which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement.' 17 C.F.R. § 229.512(a)(1)(ii)." (*Finkel v. Stratton Corp., supra,* 962 F.2d at p. 174.)

"stock actually issued in the offering for which the plaintiff claims there was a false or otherwise misleading registration statement." (*Guenther*, at p. 1441, quoting *Abbey, supra,* 634 F.Supp. at p. 872.)

Appellants, viewing the "sold after" language of section 24(e) as unambiguously referring to *any* sale of investment companies' securities after the effective date of an amendment to the registration statement, argue that we have to look at "the words chosen by Congress—not debatable policy considerations." As we have discussed, the words used in section 24(e), when read in context, do not support the interpretation appellants favor, and it is appellants who resort to "debatable policy considerations" in arguing that their interpretation "advances the ICAs overreaching goals." As stated by the United States Supreme Court, "[t]his Court has long rejected the notion that '*whatever* furthers the statute's primary objective must be the law.' *Rodriguez v. United States* [(1987)] 480 U.S. 522, 526, 107 S.Ct. 1391, 94 L.Ed.2d 533 (*per curiam*). Even if Congress could or should have done more, still it 'wrote the statute it wrote—meaning, a statute going so far and no further.' *Michigan v. Bay Mills Indian Community* [(2014)] 572 U.S. [782, 794] (internal quotation marks omitted)." (*Cyan, Inc. v. Beaver County Employees Retirement Fund, supra,* 138 S.Ct. at p. 1061.)

In any event, we are convinced that the problems appellants discuss are not ones this court can remedy. Accepting appellants' interpretation of section 24(e) would require us to depart from established law with regard to both tracing and the distinction between the focus of section 11 on primary market transactions and that of the 1934 Act on secondary market transactions. Appellants' interpretation of section 24(e)— a provision in separate legislation that does not appear to have been intended to expand standing under the 1933 Act and certainly could not have been enacted with secondary market transactions in mind—is too weak a basis for so great a departure from existing law.[17] If, as may well be the case, securities markets and financial products have changed

---

[17] The federal district court in *Scott v. ZST Digital Networks, Inc.* (C.D.Cal. 2012) 896 F.Supp.2d 877, 887–888, expressed a similar reluctance to depart from established

22

so as to undermine the protections and remedies afforded by existing securities laws, the matter requires the attention of Congress. Meanwhile, investors in this situation are not entirely without recourse. They are without recourse to the " 'relaxed liability requirements' " of the 1933 Act. (*Century Aluminum*, *supra*, 729 F.3d at p. 1107.) In light of the greater availability of information about potential investments to secondary market investors (e.g., past performance, media coverage, periodically updated disclosures), limiting the stricter liability imposed by the 1933 Act to primary market transactions is not necessarily unreasonable.

## II.

Section 12(a)(2) of the 1933 Act provides purchasers of securities with "an express cause of action for rescission against sellers who make material misstatements or omissions 'by means of a prospectus.' " (*Gustafson v. Alloyd Co., Inc.* (1995) 513 U.S. 561, 564 (*Gustafson*).) The statute provides that "any person" who "offers or sells a security . . . by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading . . . [¶] shall be liable . . . to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less

---

law in order to accommodate current practices in the securities markets. The plaintiffs in that case alleged that the defendants " 'bifurcated an [initial public offering] into sequential, duplicative registration statements to render traceability impossible.' " (*Id.* at p. 887.) The district court stated, "Although the Circuit may at some time conclude that new practices in the securities markets warrant a departure from the current strict 'traceability' rule, this Court will not be the first to chart that path. The parties offer conflicting characterizations of 'secondary offerings,' as well as the frequency with which these practices are employed, and the Court will not re-formulate long-standing federal securities law based on what essentially amounts to competing policy arguments." (*Id.* at pp. 887–888.)

the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." (§ 77l, subd. (a)(2).)

The trial court dismissed appellants' cause of action under section 12(a)(2) on the pleadings because " '[p]urchasers in private or secondary market offerings do not have standing to bring actions under [Section 12(a)(2) ].' " (*Rieckborn v. Jefferies LLC* (N.D. Cal. 2015) 81 F.Supp.3d 902, 925, quoting *In re Ultrafem Inc. Sec. Litig.* (S.D.N.Y. 2000) 91 F.Supp.2d 678, 693.) Although there are some cases to the contrary, "[t]he majority of courts who have considered this issue has concluded that purchasers who buy their shares on the secondary market lack standing to assert Section 12(a)(2) claims." (*Local 295/Local 851 IBT Employer Group Pension Trust and Welfare Fund v. Fifth Third Bancorp.* (S.D. Ohio 2010) 731 F.Supp.2d 689, 713 (*Local 295/Local 851*)*;* see, e.g., *Medina v. Clovis Oncology, Inc.* (D. Colo. 2017) 215 F.Supp.3d 1094, 1135 [section 12(a)(2) liability requires "privity and a direct relationship between buyer and seller"]; *Primo v. Pacific Biosciences of California, Inc.* (N.D.Cal. 2013) 940 F.Supp.2d 1105, 1124 (*Primo*) [following cases holding "§ 12(a)(2) liability does not extend to aftermarket transactions"]; *In re Century Aluminum Co. Securities Litigation* (N.D. Cal. 2010) 749 F.Supp.2d 964, 976 ["Section 12(a)(2) requires a plaintiff to plead and prove that it purchased a security directly from the issuer as part of the initial offering, rather than in the secondary market."]; *In re Levi Strauss & Co. Securities Litigation* (N.D. Cal. 2007) 527 F.Supp.2d 965, 983 (*Levi Strauss*) ["§ 12(a)(2) does not extend to after market transactions]; see *In re Sterling Foster & Co., Inc.* (E.D.N.Y. 2002) 222 F.Supp.2d 216, 244 (*Sterling Foster*) [discussing "the predominate conclusion that purchasers in private or secondary market offerings are precluded from bringing actions under Section 12(a)(2)."]; see *Hertzberg v. Dignity Partners, Inc., supra,* 191 F.3d at p. 1081 (*Hertzberg*) [section 12 "permits suit against a seller of a security by prospectus only by 'the person purchasing such security *from him,*' thus specifying that a plaintiff must have purchased the security directly from the issuer of the prospectus].)

Many of these cases are based upon *Gustafson*, which has been interpreted as precluding section 12(a)(2) actions by secondary market purchasers. (E.g., *Levi Strauss,*

*supra,* 527 F.Supp.2d at p. 983; *Local 295/Local 851, supra,* 731 F.Supp.2d at p. 713**;** *Primo, supra,* 940 F.Supp.2d at p. 1124; *In re Century Aluminum Co. Securities Litigation, supra,* 749 F.Supp.2d at p. 976; see *Sterling Foster, supra*, 222 F.Supp.2d at p. 244.)  The issue in *Gustafson* was whether a purchase agreement in a private sale of securities was a prospectus within the meaning of section 12.  The court held that "the word 'prospectus' is a term of art referring to a document that describes a public offering of securities by an issuer or controlling shareholder." (*Gustafson, supra,* 513 U.S. at p. 584.)  "[A]lthough *Gustafson's* 'actual holding was premised upon a public/private distinction rather than the question presented here of the coverage of 12[a](2) for sales direct from an offering versus after-market transaction, . . . the Court's *dicta* provides strong support for finding a clear dividing line on shares purchased pursuant to an offering—either initial or secondary—as cognizable for private remedies under either the 1933 and/or 1934 Act and shares purchased in the aftermarket with a private right of action existing only under the 1934 Act.' " (*Levi Strauss*, at p. 983, quoting *Murphy v. Hollywood Entertainment Corp.* (D.Or. 1996) 1996 WL 393662, *3.)  *Levi Strauss* observed that *Gustafson* "held that 'the term "prospectus" relates to public offerings by issuers and their controlling shareholders' and 'was well understood to refer to a document *soliciting the public* to acquire securities *from the issuer.*'  513 U.S. at 575–576, [emphasis in *Levi Strauss*].  Similarly, the Court has expressed that '[t]he 1933 Act regulates initial distributions of securities, and the 1934 Act for the most part regulates post-distribution trading.'  *See Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* [*supra,*] 511 U.S. [at p. 171] (citing *Blue Chip Stamps v. Manor Drug Stores,* [*supra,*] 421 U.S. [at p. 752])." (*Levi Strauss,* at p. 983.)

In finding that neither the language of section 12 nor its legislative history indicated it was intended to extend beyond public offerings, the *Gustafson* court contrasted section 12 with what it described as "the one provision of the [1933] Act that extends coverage beyond the regulation of public offerings"—section 17(a) (15 U.S.C. § 77q), making fraudulent securities transactions unlawful.  *Gustafson* explained that when the court, in *United States v. Naftalin* (1979) 441 U.S. 768, concluded that section

25

17(a) was " 'intended to cover any fraudulent scheme in an offer or sale of securities, whether in the course of an initial distribution or in the course of ordinary market trading,' " it "justified this holding—which it termed 'a major departure from th[e] limitation [of the 1933 Act to new offerings]'—by reference to both the statutory language and the unambiguous legislative history." (*Gustafson, supra,* 513 U.S. at p. 577, quoting *Naftalin,* at pp. 777–778.)  By contrast, the *Gustafson* court viewed section 12 as limiting its reach to public offerings by use of the term "prospectus," and found nothing in the legislative history suggesting it was "intended to be a freestanding provision effecting expansion of the coverage of the entire statute."  (*Gustafson,* at pp. 577–578.)

As appellants point out, the conclusion that secondary market purchasers lack standing to assert section 12(a)(2) claims is not unanimous.  Appellants point to *Feiner v. SS & C Techs., Inc.* (D.Conn. 1999) 47 F.Supp.2d 250, 253 (*Feiner*), which held that section 12(a)(2) "extends to aftermarket trading of a publicly offered security, so long as that aftermarket trading occurs 'by means of a prospectus or oral communication.' " *Feiner* reasoned that under the statutory and regulatory framework, "delivery of a prospectus is required for a fixed number of days after the registration statement becomes effective, even if the initial distribution of shares has already been completed.  See 15 U.S.C. §§ 77d, 77e; 17 C.F.R. § 230.174(d).  To limit § 12(a)(2) liability to the initial distribution would eviscerate this requirement.  Under such a reading of § 12(a)(2), the statutory and regulatory framework would require that a prospectus be delivered for a certain number of days after the beginning of an offering, but would not require that the statements in that prospectus be truthful and non-deceptive." (*Feiner,* at p. 253.)

Several of the cases above expressly reject *Feiner* as inconsistent with the *Gustafson* dicta and against the weight of authority.  (*Primo, supra,* 940 F.Supp.2d at p. 1124; *Levi Strauss, supra,* 527 F.Supp.2d at p. 983; *Local 295/Local 851, supra,* 731 F.Supp.2d at p. 714**;** *Sterling Foster, supra,* 222 F.Supp.2d at p. 245.)  Moreover, as the *Levi Strauss* court explained, even *Feiner* "did not hold that § 12(a)(2) applies to all aftermarket transactions so long as the transaction is traceable to the public offering. . . .

[A]t most the court held that § 12(a)(2) liability is *coextensive* with the prospectus-delivery requirements set forth in § 4(3) applicable to *dealers* following the effective date of the registration statement (or the first date upon which the securities are bona fide offered to the public). *See* 15 U.S.C. § 77d(3)." (*Levi Strauss,* at p. 983; see *Caiafa v. Sea Containers Ltd.* (2d Cir. 2009) 331 Fed.Appx. 14, 16–17 [2009 WL 1383457] [plaintiffs "failed to allege that they purchased securities under circumstances requiring the delivery of a prospectus and therefore fail to state a claim even under *Feiner*'s reasoning"].)

The SEC in 2002 granted iShares an exemption from the ICA's requirement that dealers must provide a prospectus to investors purchasing securities of an open end investment company (unlike those of a closed end investment company), apparently in recognition that, because shares are exchange-listed, investors have access to "several types of market information about iShares" as described in the application for the exemption, and investors would receive a "Product Description" that "while not intended as a substitute for a prospectus, . . . will contain information about iShares that is tailored to meet the needs of investors purchasing iShares in the secondary market."[18] iShares did not seek relief from the prospectus delivery requirement "for non-secondary market transactions, including purchases of creation units or those involving an underwriter."

Respondents assert that because they are not required to deliver a prospectus to secondary market investors, they cannot be held liable by such investors under section 12(a)(2). Appellants, however, point out that in granting the exemption, the SEC order

---

[18] The application for exemption stated that it sought an order "to permit dealers to sell shares of series of the Companies to purchasers in the secondary market unaccompanied by a prospectus when prospectus delivery is not required by the Securities Act of 1933." It explained that shares are issued in creation units and are not redeemable from the issuer except aggregated as creation units; that shares trade on the exchange "in a manner similar to other equity securities, including the shares of closed-end investment companies," for which dealers are not required to deliver a prospectus; and that investors will be provided with a "product description" providing specified information and advising that a prospectus and statement of additional information may be obtained without charge from the investor's broker or the distributor.

27

stated, "The exemption from section 24(d) of the [ICA] does not affect a purchaser's rights under the civil liability and anti-fraud provisions of the Securities Act. Thus rights under section 11 and section 12(a)(2) of the Securities Act extend to all purchasers who can trace their securities to a registration statement filed with the Commission, whether or not they were delivered a prospectus in connection with their purchase." According to appellants, this proviso negates respondents' argument. Further, appellants point to the earlier mentioned statements in a 2008 letter to the SEC from BGFA agreeing with "the Commission's view that it is appropriate to treat investors purchasing ETF shares in the secondary market as the intended recipients of ETF prospectus disclosure." In announcing its rule amendments, "intended to result in the disclosure of more useful information to investors who purchase shares of exchange-traded funds on national securities exchanges," the SEC stated that the amendments would "permit a person to satisfy its mutual fund prospectus delivery obligations under Section 5(b)(2) of the Securities Act [§ 77e(b)(2)] by sending or giving the key information directly to investors in the form of a summary prospectus and providing the statutory prospectus on an Internet Web site." The SEC stated that the amendments were "designed to meet the needs of investors (including retail investors) who purchase ETF shares in secondary market transactions rather than financial institutions that purchase creation units directly from the EFT." (SEC Release Nos. 33-8998; IC-28584; File No. S7-28-07, pp. 1, 51.)

In light of the SEC's obvious focus on the needs of secondary market investors, as well as its qualification regarding 1933 Act liability in the order granting relief from the prospectus delivery requirement, we are hesitant to accept respondents' view that this exemption immunizes them from liability under section 12(a)(2). Nevertheless, in addition to the fact that the majority of federal cases, unlike *Feiner*, view secondary market investors as lacking standing to assert claims under section 12(a)(2), another consideration causes us to agree that appellants lack standing here.

Liability under section 12(a)(2) "extends only to the 'immediate sellers' of securities and 'those who solicit purchasers to serve their own financial interests or those of the securities owner.' " (*In re Countrywide Financial Corp. Mortgage-Backed*

28

*Securities Litigation* (C.D. Cal. 2013) 932 F.Supp.2d 1095, 1118 (*Countrywide*), quoting *Maine State Retirement System v. Countrywide Financial Corporation* (C.D.Cal. May 5, 2011) 2011 WL 4389689, *9 (*Maine State Retirement System*).) As indicated above, section 12 "permits suit against a seller of a security by prospectus only by 'the person purchasing such security *from him*,' thus specifying that a plaintiff must have purchased the security directly from the issuer of the prospectus." (*Hertzberg, supra,* 191 F.3d at p. 1081, quoting § 77*l*(a)(2), italics in *Hertzberg*.) "This is an express privity requirement, giving a cause of action only to individuals who purchase securities directly from a person who sells the securities by means of a prospectus." (*Joseph v. Wiles* (10th Cir. 2000) 223 F.3d 1155, 1161, abrogated on other grounds in *California Public Employees' Retirement System v. ANZ Securities, Inc.* (2017) ___U.S. ___, 137 S.Ct. 2042, 2048, 2052.)

The parameters of a statutory "seller" under section 12[19] were established in *Pinter v. Dahl* (1988) 486 U.S. 622, 642, 647 (*Pinter*). *Pinter* held that liability under section 12 "is not limited to persons who pass title" but also extends to one who "successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner."[20] But the court limited its holding, noting that

---

[19] Although *Pinter* expressly addressed section 12(a)(1) and not section 12(a)(2), courts have concluded that because of the identical language used in the two sections, the *Pinter* analysis applies to section 12(a)(2) as well. (E.g., *Moore v. Kayport Package Express, Inc.* (9th Cir. 1989) 885 F.2d 531, 536; *Craftmatic Securities Litigation v. Kraftsow* (3d Cir. 1989) 890 F.2d 628, 635; *Capri v. Murphy* (2d Cir. 1988) 856 F.2d 473, 478.)

[20] As one court explained, "Although the 'purchasing from' language in the statute literally appears to contemplate a relationship between defendant and plaintiff 'not unlike traditional contractual privity,' *Pinter,* [*supra,*] 486 U.S. at 642, the *Pinter* Court held that Section 12 liability is not limited to those who actually pass title to the suing purchaser. *See id.* at 645. This is so because even 'in common parlance,' a person may 'offer or sell' property without actually passing title. *Id.* at 642. For example, a broker or agent who solicits a purchase 'would commonly be said . . . to be among those "from" whom the buyer "purchased," even though the agent himself did not pass title.' *Id.* at 644. Furthermore, because 'solicitation is the stage at which an investor is most likely to be

section 12 "imposes liability on only the buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers. Thus, a buyer cannot recover against his seller's seller." (*Pinter,* at p. 644; *Shaw, supra,* 82 F.3d at p. 1215.) The court stated that "[t]he 'purchase from' requirement of § 12 focuses on the defendant's relationship with the plaintiff-purchaser" (*Pinter,* at p. 651); it is not enough that the defendant was a "substantial factor" in causing the transaction. (*Ibid.*; *Shaw*, at p. 1215.) Nor is it sufficient that a defendant participated in "solicit[ing] the purchase." (*Pinter,* at p. 651, fn. 27; *Shaw*, at p. 1215.) "A defendant must be directly involved in the actual solicitation of a securities purchase in order to qualify, on that basis, as a Section 12 'seller.' *See In re Craftmatic* [*Securities Litigation v. Kraftsow, supra,*] 890 F.2d at 636; *Capri v. Murphy*[*, supra,*] 856 F.2d [at 478–479]; *Dawe* [*v. Main Street Management Company* (D. Mass 1990)] 738 F.Supp. [36,] 37.)" (*Shaw,* at p. 1215.) "An allegation of direct and active participation in the solicitation of the immediate sale is necessary for solicitation liability . . . so as to ensure a direct relationship between the purchaser and the defendant, without which a defendant is simply not a statutory seller." (*In re Westinghouse Sec. Litig.* (3d Cir. 1996) 90 F.3d 696, 717, fn. 19.)

*Shaw* involved a "firm commitment" underwriting, in which "the issuer of the securities sells all of the shares to be offered to one or more underwriters, at some discount from the offering price" and investors "purchase shares in the offering directly from the underwriters (or broker-dealers who purchase from the underwriters), not directly from the issuer." (*Shaw, supra,* 82 F.3d at p. 1215.) Because the issuer did not pass title to the securities to investors, it could be liable under section 12(a)(2) only if it "actively 'solicited' the plaintiffs' purchase of securities to further their own financial

---

injured,' *id.* at 646, the Court found it consistent with the policies of the statute to permit imposition of liability on a non-owner of securities who 'successfully solicits' the plaintiff's purchase of the securities, provided that the solicitor is 'motivated at least in part by a desire to serve his own financial interests or those of the securities owner.' *Id.* at 647." *(Shaw v. Digital Equipment Corp.* (1st Cir. 1996) 82 F.3d 1194, 1214-1215 (*Shaw*).)

motives, in the manner of a broker or vendor's agent"; otherwise, it was simply a " 'seller's seller.' " (*Ibid.*; *Pinter, supra,* 486 U.S. at p. 644.) In that case, the factual allegations regarding the issuer pertained to "involvement in preparing the registration statement, prospectus, and other 'activities necessary to effect the sale of the[] securities to the investing public.' " (*Shaw,* at p. 1216.) *Shaw* found the allegations insufficient to demonstrate "the kind of *relationship between defendant and plaintiff* that could establish statutory seller status"—the " 'solicited and/or was a substantial factor in the purchase by plaintiffs' " was insufficient because *Pinter* rejected a "substantial factor" test, and the allegation that the defendants "solicited" the plaintiffs' purchases was conclusory and "factually unsupported." (*Ibid.*; *Pinter,* at p. 651 & fn. 27.)

*Lone Star Ladies Inv. Club v. Schlotzsky's Inc.* (5th Cir. 2001) 238 F.3d 363, 369, similarly held that in a firm commitment underwriting, "the public cannot ordinarily hold the issuers liable under section 12, because the public does not purchase from the issuers." The court stated, "It is true that there are unusual cases in which the issuer is sufficiently active in promoting the securities as to essentially become the vendor's agent. But that possibility does not weaken this basic principle. Virtually all issuers routinely promote a new issue, if only in the form of preparing a prospectus and conducting a road show. That said, *Pinter* holds that a plaintiff invoking section 12 may show that an issuer's role was not the usual one; that it went farther and became a vendor's agent." (*Lone Star,* at p. 370.)

Here, respondents assert that appellants did not allege them to have been directly or indirectly involved in selling shares on the secondary market, or to satisfy any of the factors *Pinter* noted in discussing what might make a person who did not pass title to the investor a "seller." In *Pinter,* the question was whether an individual investor who told others about the venture, in which they subsequently invested, could be considered a seller by virtue of receiving financial benefit such as a share of the profits from the sale or commission, or soliciting the sale to "serve the financial interests of the owner," as opposed to having urged the purchase only to assist or benefit the buyer. (*Pinter, supra,* 486 U.S at pp. 654–655, 647.) The necessary inquiry, the court explained, "focuses on

31

the defendant's relationship with the plaintiff-purchaser," not "the defendant's degree of involvement in the securities transaction and its surrounding circumstances." (*Id.* at p. 651.)

Appellants maintain that they sufficiently alleged both motive and solicitation. As to the former, they cite allegations that BlackRock is the world's largest asset manager ($4.5 trillion) and iShares the world's largest ETF provider ("700 ETFs globally with more than $1 trillion under management as of December 31, 2014"), and that BlackRock " 'earns its fees from the Funds based on the Fund's allocable portion of the aggregate of the average daily net assets' of the iShares Funds." As to solicitation, appellants argue that "BlackRock maintains a website encouraging investors to buy its ETFs"; that respondents "filed, issued and distributed Offering Documents to investors," "published misinformation about their funds in guides, brochures, and websites directed to investors and their advisors," "sent letters to shareholders to calm investors and keep them from fleeing the funds," and "gave interviews to the financial press promoting their funds." Appellants assert that respondents "were not earning their money from the sales to the intermediary Authorized Participants who slipped in and out of the shares to facilitate trading for retail investors such as plaintiffs" and that respondents acknowledged "retail investors are the 'intended recipients of ETF prospectus disclosure.' "

With respect to solicitation, reading the allegations of the first amended complaint, rather than appellants' description of them, the complaint alleges that respondents' website describes its ETF funds as safe long term investment vehicles, acting as an "emergency brake" against volatility in the market, that respondents, on the BlackRock website and in the media, responded to criticisms that investors are given insufficient information to understand the risks of ETFs, and "glossed over" the risks, published misinformation about their funds in guides and brochures, including an "Adviser Guide to ETFs" that failed to mention specific risks and promoted the "benefits of ETFs for advisers," "encourage[d] investors to use market and stop-loss orders in conjunction with ETF purchases" "published and mailed" to owners of ETF shares an " 'Open Letter to Our Investors' " that inaccurately responded to concerns about volatility in the market,

and at the same time told the media that nothing out of the ordinary was happening.  The complaint alleged that appellants and class members purchased shares of the ETFs "pursuant to the offering documents" and "pursuant and/or traceable to the continuous registration statement" filed with the SEC by iShares Trust.

Most of these allegations appear to reflect general advertising and promotions of the product to the public rather than direct or immediate solicitation of appellants' purchases.  As such, the factual allegations fail to demonstrate " ' "a direct relationship between the defendant and the plaintiff purchaser.  [Citation.]" ' " (*In re Municipal Mortg. & Equity, LLC* (D. Md. 2012) 876 F.Supp.2d 616, 661–662, quoting *In re Constellation Energy Group, Inc.* (D.Md. 2010) 738 F.Supp.2d 614, 632.)  "To count as 'solicitation,' the seller must, at a minimum, directly communicate with the buyer." (*Rosenzweig v. Azurix Corp.* (5th Cir. 2003) 332 F.3d 854; *Maine State Retirement System, supra,* 2011 WL 4389689, at *10 ["Plaintiffs must include very specific allegations of solicitation, including direct communication with plaintiffs."].)  Appellants have not alleged any direct contact with them by respondents, and to the extent they allege direct contact by respondents with investors generally, it is in connection with attempts to prevent ETF shareholders from divesting themselves of the securities, not solicitation of new purchases of shares.  The complaint thus fails to allege the necessary "direct and active participation in the solicitation of the immediate sale to hold the issuer liable as a § 12(2) seller" (*Shaw, supra*, 82 F.3d at pp. 1214–1215), given that appellants purchased their ETF shares on the secondary market, not directly from respondents.[21]

---

[21] Appellants' assertion that an issuer "is always liable as a seller under Section 12(a)(2) where the sale of the security is pursuant to a prospectus" is not accurate. Appellants offer SEC rule 159A (17 C.F.R. § 230.159A(a)), which provides, "[F]or purposes of section 12(a)(2) of the Act only, *in a primary offering* of securities of the issuer, regardless of the underwriting method used to sell the issuer's securities, seller shall include the issuer of the securities sold to a person as part of the *initial distribution* of such securities, and the issuer shall be considered to offer or sell the securities to such person, if the securities are offered or sold to such person by means of any of the following communications:  [¶] (1) Any preliminary prospectus or prospectus of the

Appellants complain that respondents are responsible for the contents of the registration statements and prospectuses for their ETF funds, and by design, shares in these funds are intended to be traded on the secondary market, but because ETFs do not transact directly with secondary market investors, respondents can avoid liability under section 12(a)(2) for falsehoods or misstatements in, or material omissions from, their offering documents.  Appellants thus question the effectiveness of section 12, as it has been interpreted with respect to standing, in ensuring for the particular financial product at issue here the full and accurate disclosure the legislation was intended to provide to investors.  It must be reiterated, however, that this problem is a function of appellants' decision to pursue claims under the 1933 Act.  As has been observed, "[a]s a policy matter, . . . because Section 12(a)(2) claims do not require allegations of scienter, reliance or loss causation, liability is more easily established.  See *In re Morgan Stanley Info. Fund Sec. Litig.* [(2d Cir. 2010)] 592 F.3d [347, 359–360].  This aspect of the statute supports a more narrowly drawn interpretation of a statutory seller." (*Maine State Retirement System, supra,* 2011 WL 4389689, *10.)  "[I]n contrast to their ' "catchall" '

_____

issuer relating to the offering . . . ."  (Italics added.)  As indicated by the italicized text, this rule pertains to "primary" offerings of securities, that is, "initial distributions."  The present case involves only secondary market purchasers of securities.

Furthermore, several courts have held that because an SEC regulation "cannot countermand a contrary Supreme Court holding," SEC rule 159A cannot prevail over *Pinter*'s holding that a defendant who did not directly sell the security to the purchaser can be liable under section 12 only if " 'directly involved in the actual solicitation of a securities purchase.' " (*Massachusetts Mut. Life Ins. Co. v. Residential Funding Co., LLC* (D. Mass. 2012) 843 F.Supp.2d 191, 207, quoting *Shaw, supra,* 82 F.3d at 1215; *Federal Home Loan Bank of Boston v. Ally Financial, Inc.* (D.Mass. Sept. 30, 2013) 2013 WL 5466631, *4; *In re Kosmos Energy Ltd. Secs. Litig.* (N.D.Tex. 2013) 955 F.Supp.2d 658, 672; *Maine State Retirement System, supra,* 2011 WL 4389689, *10.)  At least one court has held that the SEC exceeded its authority in adopting the rule.  (*Countrywide, supra,* 932 F.Supp.2d at p. 1118; but see *National Credit Union Administration Board v. RBS Securities, Inc.* (C.D.Cal. Dec. 19, 2013) 2013 WL 12320069, *5 [disagreeing with *Countrywide*].)

cousin in the Exchange Act—section 10(b), 15 U.S.C. § 77j(b)[22]—sections 11 and 12(a)(2) of the Securities Act apply more narrowly but give rise to liability more readily." (*In re Morgan Stanley Info. Fund Sec. Litig.*, at pp. 359–360.)

## DISPOSITION

The judgment is affirmed.

Costs on appeal to respondents.

---

[22] We assume the intended reference was to title 15 of the United States Code section 78j(b), section 10(b) of the 1934 Act.

_____
Kline, P.J.

We concur:


_____
Richman, J.


_____
Stewart, J.


*Jensen et al. v. iShares Trust et al.* (A153511)


36

Trial Court:                                    San Francisco County Superior Court

Trial Judge:                                    Hon. Curtis E.A. Karnow


Attorneys for Plaintiffs and Appellants:        Hagens Berman Sobol Shapiro
                                                Reed R. Kathrein
                                                Peter E. Borkon
                                                Danielle Smith
                                                Kevin K. Green


Attorneys for Defendants and Respondents:       Skadden, Arps, Slate, Meagher & Flom
                                                Jeremy A. Berman
                                                Eben P. Colby
                                                Patrick M. Hammon

                                                Stroock & Stroock & Lavan
                                                John R. Loftus